981 A.2d 759

**Ahmed M. ALI**

v.

**CIT TECHNOLOGY FINANCING SERVICES, INC.**

**No. 1313, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

Oct. 5, 2009.

Richard I. Chaifetz, Columbia, for Appellant.

Harold G. Belkowitz (Ober, Kaler, Grimes & Shriver, on brief), Washington, DC, for Appellee.

Panel: DAVIS, SALMON, and EYLER, JAMES R., JJ.

EYLER, JAMES R., J.

This appeal is from a judgment entered by the Circuit Court for Prince George's County against Ahmed M. Ali, appellant, and in favor of CIT Technology Financing Services, Inc., appellee, in the amount of $190,725.85 in damages and $21,977.95 in prejudgment interest. Appellant contends that the trial court should have dismissed the suit because it was barred by the applicable statute of limitations; the trial court erred when it calculated the amount of damages; and the trial court erred when it calculated pre-judgment interest. We shall vacate the judgment, affirm as to liability, but remand to the circuit court for assessment of damages.

## Factual and Procedural Background

In June, 1997, appellee's predecessor/lessor entered into an equipment lease with appellant. The lease required appellant to pay $3,275.60 per month for 60 months. The total amount of rental payments due under the lease was $196,536.

In May, 1999, appellant defaulted. Appellee sent a letter dated August 10, 2000, demanding that appellant pay $158,760.86 by August 20, 2000. Presumably, appellee calculated this amount under the terms of the lease, which allowed appellee to "declare all Rental Payments due hereunder due and payable," and to take possession of the equipment. The amount claimed by appellee was for the accelerated rental payments, late charges, and the value of the unreturned equipment. Appellant failed to pay all or any portion of that amount by August 20, 2000.

On June 11, 2001, appellant filed a chapter 11 petition in bankruptcy in the United States Bankruptcy Court for the District of Maryland. Appellee could not pursue its claim

outside of the bankruptcy proceeding because of the automatic stay provision in 11 U.S.C. § 362. In 2002, appellee filed a claim in the bankruptcy proceeding for unsecured debt in the amount of $158,760.86, and in 2003, a claim for administrative expenses in the amount of $85,165.70, which included the cost of appellant's post-petition use of the equipment.

In July, 2003, appellee moved to lift the stay. In September 2003, the bankruptcy court granted the motion and provided in its order

> that the stay of § [ ]362 of the Bankruptcy Code is terminated and, with respect to the Lease Equipment, [appellee] is authorized to exercise all of its rights under the Lease and applicable non-bankruptcy law including, without limitation, foreclosure, sale and repossession; and it is further [ordered], that [appellant] shall surrender the Lease Equipment ... to appellee ... within 10 days of the date hereof [and] that [appellant] shall allow [appellee] ... access to the Lease Equipment to the extent necessary to carry out the rights granted to [appellee]. . . .

Appellant continued to possess the equipment without making any monthly payments to appellee.

In August of 2004, the parties entered into a stipulation and proposed consent order that allowed appellee a general unsecured claim in the amount of $190,725.86, allowed appellee an administrative claim in the amount of $53,200, and authorized appellant to execute all documents necessary to consummate the transactions referred to in the stipulation. The bankruptcy court executed the consent order, thus allowing both claims.[1]

The transactions referred to in the stipulation related to the administrative claim. These transactions included a payment schedule, a confessed judgment note, a transfer of the equipment's title to appellant, and appellant's grant of a security

---

1. A claim is an asserted "right to payment. . . ." 11 U.S.C. § 101(5). The effect of allowing the claims was that appellee had a right to distribution from the debtor's estate. *Id.* § 502.

interest in the equipment to appellee. Appellant paid appellee approximately $26,200 under the note but failed to pay the remainder of the money due. In accordance with a confession of judgment provision in the note, appellee obtained a confessed judgment for $30,400 against appellant in a separate action, which is not before us.

Appellee did not recover any portion of the unsecured claim by way of a distribution in the bankruptcy proceeding. On July 12, 2006, the bankruptcy court dismissed appellant's bankruptcy case without discharge of debts.

In January, 2007, appellee filed this suit against appellant for breach of the lease. In March, 2008, appellee filed an amended complaint, in which it added a count seeking to enforce the stipulation and consent order.

On April 16, 2008, the circuit court heard the case nonjury. Appellee argued that appellant had breached the lease and that appellee was entitled to the accelerated amount of unpaid rental payments, 18% interest, the value of the equipment, and reasonable attorney's fees. The claim tracked the language in the lease. In the alternative, appellee argued that the court should find liability and assess damages based on appellant's failure to fulfill the terms of the stipulation and order. Appellant acknowledged breach of the lease, but argued that the suit was barred by limitations, the stipulation and order could not be the basis for liability, and the dollar amount in the stipulation and order did not reflect credit for all payments.

Appellee introduced into evidence, *inter alia,* the lease, and presented testimony relating to the breach of lease, the consequences of its breach, and the amounts due under the lease, which included the remaining lease payments, taxes, late charges, the value of the equipment, and attorney's fees. Appellee also introduced evidence of the amount of attorney's fees incurred by appellee during the bankruptcy proceeding and thereafter, until the date of trial. Additionally, appellee introduced the stipulation and consent order.

In an order dated May 27, 2008, and docketed May 30, 2008, the circuit court found that appellant, in May 1999, had

defaulted under the lease. The court held that the three year period of limitations contained in Maryland Code (2006 Repl. Vol.), § 5–101 of the Courts and Judicial Proceedings Article ("CJP") was tolled during the pendency of the bankruptcy proceeding, because federal bankruptcy law incorporated relevant State statutes, including the tolling provision in § 5–202 of the same Article.

Section 5–202 provides:

If a debtor files a petition in insolvency which is later dismissed, the time between the filing and the dismissal is not included in determining whether a claim against a debtor is barred by the statute of limitations.

The court, implicitly referring to the stipulation and consent order, also stated, in pertinent part, "[t]he parties rejected the lease, by agreement, in August, 2004. The parties further agreed that [appellee's] debt to [appellant] was $190,725.85. Prejudgment interest accruing from the date of dismissal of the bankruptcy matter is $21,977.95. [Appellant] remains free to retrieve the property, and no reason for its failure to do so was proffered."

This timely appeal followed.

### Issues Presented

Appellant presents the following questions, quoted from his brief:

I. Whether the [court] erred in granting judgment in favor of appellee because the applicable statute of limitations had expired?

II. Whether the [court] erred in granting judgment for an amount which exceeded the amount actually owing under the lease?

III. Whether the [court] erred in granting an award of prejudgment interest without any calculation of interest having been submitted and subjected to challenge?

### Standard of Review

Because the trial was nonjury,

we give deference to the factual findings of the trial judge and will reverse only for clear factual error. A factual finding is clearly erroneous if there is no competent and material evidence in the record to support it. The legal conclusions reached by the circuit court are not accorded deference on appeal, however, and instead are reviewed *de novo*.

*Hoang v. Hewitt Ave. Ass., LLC*, 177 Md.App. 562, 576, 936 A.2d 915 (2007) (citations omitted).

## Discussion

### I. *Statute of Limitations*

#### A. *Contentions*

In this case, the applicable period of limitations is three years. CJP § 5–101.[2] The parties agree that the statute of limitations began to run in May 1999 when appellant defaulted under the lease. In June 2001, when the petition in bankruptcy was filed, approximately 25 months had passed, leaving 11 months to file suit. The automatic stay was in effect from June 2001 until September 2003. *See* 11 U.S.C. § 362. Appellant argues that, while the period of limitations may have been tolled under federal law, by operation of 11 U.S.C. § 108(c),[3] it was tolled only during the time the automatic stay was in effect. According to appellant, appellee was free to take action in September 2003, when the stay was lifted, but did not file suit until January 2007, almost five and one-half years after the default. Appellant, after observing that CJP § 5–202 was enacted in 1814 when there was no federal

---

**2.** Appellee argues that its "claim is alternatively not time barred under the twelve year statute of limitations for specialities.[CJP] § 5–102." Appellee failed to make this argument below; thus, we shall not consider it.

**3.** Section 108, subsections (a) and (b), address extensions of time for actions by or on behalf of the debtor, and subsection (c) addresses extensions of time for actions against the debtor. Section 108 incorporates relevant state law to a certain extent. We discuss and quote § 108 *infra*.

bankruptcy statute and state insolvency laws governed, argues that those insolvency laws have since been repealed and CJP § 5–202 is irrelevant and of no effect today. Appellant also argues that, by its plain language, the statute applies only to insolvency proceedings, which do not include bankruptcy proceedings.

Appellee contends that CJP § 5–202 is still good law, that the statute's effect was to toll the statute of limitations during the pendency of the bankruptcy proceeding, and that limitations resumed running when the bankruptcy court dismissed the bankruptcy petition, in July 2006. Thus, appellee concludes that the suit in January, 2007 was timely.

### B. *Historical Perspective*

We pause to briefly review the history of state insolvency laws and federal bankruptcy law because it provides a context for understanding CJP § 5–202.

In England, prior to the birth of the United States, a "bankruptcy" proceeding was involuntary, applied only to traders for commercial purposes, and the proceeding was one in which debts were discharged. Bankruptcy was punishable, at times, by death. Imprisonment for nonpayment of debts was common. England had a separate insolvency system for discharging persons from imprisonment for debts, upon surrendering all property to the creditors. Charles Warren, Bankruptcy in United States History 7 (1935); *See* David A. Skeel, Jr., Debt's Dominion: A History of Bankruptcy Law in America 27 (2001). Thus, the concept of "bankruptcy" was involuntary, included the discharge of debts, and was limited to traders.

In this country, the appropriateness and composition of bankruptcy and insolvency laws was debated throughout the late 1700s, so much so that the topic was discussed during the Federal Convention of 1787. *See* Warren, *supra* at 3–4. As a result of the debate at the Federal Convention, Clause 4 of Section 8 of Article I of the Constitution was added, providing

Congress with the power "[t]o establish ... uniform laws on the subject of bankruptcies throughout the United States."

The meaning of this clause, including whether it was limited to bankruptcy as the term was originally used, and the extent of Congress' power, including its preemptive effect, was debated for the next one hundred years. *See* Skeel, *supra,* at 23–47 (2001); *see generally* Warren, *supra.* In general, the nation debated whether the clause only applied to merchants and traders, like bankruptcy laws in England, or whether it applied to all classes of people, including corporations, like many state insolvency laws. Warren, *supra,* at 6. The nation debated various other issues, including whether the clause only allowed for involuntary bankruptcy, as in England, or whether the clause allowed for both voluntary and involuntary bankruptcy, like many state insolvency laws; whether debts incurred prior to the effective date of the law could be discharged; and the availability of state exemptions. *See id.*

In the late 1700s, only a few states had insolvency laws, but many more were enacted in the 1800s. There was no clear line of demarcation between bankruptcy and insolvency as there had been in England. *Id.* at 7, 13. Generally, the state laws extended to all debtors but did not discharge debts. Rather, they provided for release from imprisonment, staying proceedings by creditors, and appraising the debtor's assets to protect fair value. *Id. See* John L. Dorsey, A Treatise on the American Law of Insolvency 5–6 (1832); Warren, *supra,* at 6–7, 13, 146–49. The question of the extent of Congress's power, i.e., whether it preempted the field, was a continuing issue.

In any event, the intensity of bankruptcy and insolvency debate was tied to the ebb and flow of the economy throughout the 1800s: proponents called for national bankruptcy laws during periods of recession and depression, but such movements lost momentum in prosperous times. *See* Skeel, *supra,* at 24–28. All the while, states enacted insolvency laws, generally granting rights to debtors, to fill the void left by the lack of a national bankruptcy law. *Id.*

For example, Congress passed the first national bankruptcy bill in 1800 following the burst of a real estate bubble, commercial losses due to the capture of ships by the French, and rampant business failures in New York, Philadelphia, and, notably, Baltimore. Bankruptcy Act of 1800, ch. 19, 2 Stat. 19; Warren, *supra*, at 18. This first national bankruptcy bill lasted only three years. Act of Dec. 19, 1803, ch. 6, 2 Stat. 248. Congress repealed the bill in 1803 because the public generally was dissatisfied with the bill. Warren, *supra*, at 19–20. In part, the public was dissatisfied with the bill because debtors fraudulently manipulated the bill to avoid paying creditors. *Id.*

Following the repeal of the Bankruptcy Act of 1800, states continued to enact and maintain insolvency laws. Shortly after the repeal of the federal statute, a federal court held a Pennsylvania insolvency law unconstitutional because it purported to discharge prior debts and because it was preempted by the authority given to Congress. *Id.* at 22–23. A New York court reached a different conclusion with respect to a New York statute. *Id.* In 1819, the United States Supreme Court, in an opinion by Chief Justice Marshall, held that New York's insolvency law was unconstitutional as applied to prior contracts. *Sturges v. Crowninshield,* 4 Wheat. 122, 17 U.S. 122, 4 L.Ed. 529 (1819); Warren, *supra*, at 24. A Louisiana insolvency law also was declared invalid the same day. *M'Millan v. M'Neill,* 4 Wheat. 209, 17 U.S. 209, 4 L.Ed. 552 (1819); Warren, *supra*, at 24.

A tough recession in the 1820s revived the debate concerning a national bankruptcy statute. Warren, *supra*, at 25–45. The debate came to a head in 1827, when a heated effort to enact a national bankruptcy statute was defeated. *Id.* at 40–45. At that time, whether state insolvency laws could apply to prior contracts and whether they were preempted in any event were still open questions. Following the defeat of a national statute, state insolvency laws gained momentum. *Id.* at 51–52. The Supreme Court bolstered this momentum with its 1827 ruling in *Ogden v. Saunders,* 12 Wheat. 213, 25 U.S. 213, 6 L.Ed. 606 (1827), upholding the states' power to pass

insolvency laws that applied to future contracts. In that time period, the state laws varied widely with respect to the type of property subject to the insolvency proceeding, treatment of preferences, availability of stays, availability of discharge from imprisonment,[4] the discharge of debts, and availability of an appraisal remedy. *Id.* at 36. None of the state laws discharged a debtor from debts due to citizens of states other than the state in which the law in question was enacted. *Id.* at 91.

Nevertheless, another depression renewed the debate over a national bankruptcy statute, and Congress passed such a statute in 1841. Bankruptcy Act of 1841, ch. 9, 5 Stat. 440; Warren, *supra,* at 72. Unlike the previous statute, the 1841 statute provided for voluntary bankruptcy and extended to classes of debtors other than traders and merchants. *See* Bankruptcy Act of 1841, ch. 9, 5 Stat. 440 Warren, *supra,* at 72–79. Although the bill was enacted, and was generally successful, opposition grew because it was expensive to administer, paid very small dividends to creditors, and many viewed it as duplicating state insolvency proceedings. Warren, *supra,* at 81–82, 84–85. Consequently, Congress repealed the law a little over one year after its enactment. Act of Mar. 3, 1843, ch. 82, 5 Stat. 614. In the decade that followed, states, including Maryland in 1854, passed additional laws related to insolvency. Skeel, *supra,* at 25; *see also* Warren, *supra,* at 91.

In what was becoming a pattern, Congress passed yet another bankruptcy statute in 1867 following economic and political turmoil. Bankruptcy Act of 1867, ch. 176, 14 Stat. 517; Warren, *supra,* at 95–105. Shortly after Congress enacted the statute, however, opponents began calling for its repeal. Warren, *supra,* at 109. Like its predecessors, the statute was repealed, but this time it lasted 11 years—until 1878. *Id.* at 122. During all of this time, bankruptcy and insolvency proceedings continued to be separate concepts generally, the

---

4. The states abolished imprisonment for debt, beginning in 1821. By 1857, almost all states and the federal government had abolished imprisonment for debt. Warren, *supra,* at 52.

distinction turning on the ability or lack thereof to discharge debts, although the concepts were increasingly blurred and the terms were not used consistently.

By the late 1800s, it was clear that many state insolvency laws were unconstitutional due to the prohibition against states passing "law[s] impairing the obligation of contracts...." U.S. Const. art. I, § 10; *see also* Warren, *supra,* at 88. Nevertheless, despite that and preemption issues, many state insolvency laws remained active simply because they were not challenged. Warren, *supra,* at 148.

The financial crisis of 1893 produced yet another national bankruptcy statute in 1898. The 1898 statute applied to all classes of debtors, and provided for voluntary and involuntary bankruptcy. *See* Act of July 1, 1898, ch. 541, 30 Stat. 544; Warren, *supra,* at 140–41. In 1902, not long after the passage of the 1898 national bankruptcy statute, the Supreme Court made clear that Congress possessed plenary power over bankruptcies, broadly defined. *Hanover Nat'l Bank v. Moyses,* 186 U.S. 181, 22 S.Ct. 857, 46 L.Ed. 1113 (1902). After over 100 years of uncertainty about the scope of Congress' power in the context of bankruptcies, it was clear that Congress not only possessed plenary power over bankruptcies as originally understood in 1786, but it also possessed plenary power, as presently understood, over a wide range of activities that were, at one time, the subject of insolvency proceedings.

Since then, bankruptcy law has been stable and has withstood complete repeal, although it has been amended and replaced on several occasions, perhaps most notably in the 1930s and the 1970s. *See generally* Skeel, *supra,* at 48–238. Modern bankruptcy practice has included voluntary and involuntary proceedings and liquidation, rehabilitation, and reorganization measures for individuals and business entities, including corporations.

## C. *The Maryland Statute*

Although it is clear now that Congress has plenary power over bankruptcies, as broadly and presently defined, Congress

has not abrogated all state law on the subject. For example, 11 U.S.C. § 108(c) provides:

> (c) Except as provided in [11 U.S.C. § 524], *if applicable nonbankruptcy law,* an order entered in a nonbankruptcy proceeding, or an agreement *fixes a period for commencing or continuing a civil action in a court other than a bankruptcy court on a claim against the debtor,* or against an individual with respect to which such individual is protected under [11 U.S.C. §§ 1201, 1301], and such period has not expired before the date of the filing of the petition, then such period does not expire until the later of—
>
> (1) *the end of such period, including any suspension of such period occurring on or after the commencement of the case; or*
>
> (2) 30 days after notice of the termination or expiration of the stay under [11 U.S.C. §§ 362, 922, 1201 or 1301], as the case may be, with respect to such claim.

(Emphasis added).

In essence, subsection (c) provides that if state law fixes a period for commencing a civil action in a nonbankruptcy court against the debtor, and the period has not expired before the date of filing of the petition in bankruptcy, then the period does not expire until the later of (1) the end of that period, including any suspension of such period occurring on or after the commencement of the case, or (2) thirty days after the stay is lifted. As an aside, the courts that have interpreted section 108(c) are not in agreement as to its meaning, specifically, whether it tolls a statute of limitations during the existence of a stay with a minimum of thirty days after the stay is lifted, *e.g., Kertesz v. Ostrovsky,* 115 Cal.App.4th 369, 8 Cal.Rptr.3d 907 (2004), or whether it does not toll but provides a minimum of thirty days after a stay is lifted. *E.g., National Bank of Commerce Trust & Savings* Ass'n, 256 Neb. 679, 592 N.W.2d 477 (1999). We need not decide that issue because, in either event, the complaint was not timely.

Thus, the outcome on the limitations issue turns on the effect of CJP § 5–202 because, absent CJP § 5–202, the

complaint was filed too late. If the period of limitations was tolled during the pendency of the bankruptcy proceeding, the complaint was timely.

Appellant's arguments are interrelated. Appellant's primary argument is that CJP § 5–202 was enacted in 1814 when no federal bankruptcy law existed, that its intent was to apply to state insolvency proceedings, and that it is archaic and of no effect. In 1805, Maryland enacted an insolvency law.[5] Under that law, an insolvent was defined as a person unable to liquidate his debts. Ch. 110 of the Acts of 1805; Dorsey, *supra*, at 18. A debtor could file a petition, and offer his property to creditors. Dorsey at 31. A judge, after determining that the debtor had not acted fraudulently, in bad faith, or the like, and had complied with all requirements contained in the law, could discharge the debtor from prison and also from certain debts, the latter with the consent of certain creditors. *Id.* at 3, 31, 77.

Maryland amended its insolvency laws from time to time. One such amendment, which is relevant to our analysis, occurred in 1814. At that time, the General Assembly enacted ch. 122, Acts of 1814. Section 1 of that statute limited the ability of courts to continue pending petitions from one court session to another. Section 2 provided that, upon dismissal or withdrawal of a petition, or a decision adverse to the petitioner, it was not necessary for a creditor to revive any judgment suspended by the petition. Section 3 provided: "That the time intervening between the petitioning of any of said debtors and the time that any of said petitions may be dismissed, shall not be computed on any plea of limitation so as to defeat any claim of any person against such debtor." Ch. 122 of the Acts of 1814; Dorsey, *supra*, at 67–68. We conclude from the historical context that the General Assembly enacted this provision to address the public's complaint that debtors manipulated the bankruptcy and insolvency processes to avoid paying creditors by entering bankruptcy, waiting for the stat-

---

5. An insolvency law may have existed prior to 1805, but we have not sought to determine that because it is irrelevant to our analysis.

ute of limitations to expire, and subsequently dismissing the bankruptcy proceeding. *See also* Dorsey, *supra,* at 15. We also conclude that, at the time of its enactment, this section clearly referred to state insolvency proceedings because no federal bankruptcy statute existed.

At some point in time, the General Assembly placed the vast majority of insolvency laws in Art. 47, but placed the statute in question in Article 57, with other limitations statutes. At some point prior to 1860, the General Assembly slightly changed the wording of the provision to read: "The time intervening between the petitioning of an insolvent debtor, and the time when his petition may be dismissed, shall not be computed on any plea of limitation so as to defeat the claim of any person against such debtor." [6] *See* Maryland Code of 1860, Art. 57, § 8. At a later point, the General Assembly moved this provision to Art. 57, § 9.

Art. 57, § 9 remained unchanged until 1973, when the General Assembly recodified Art. 57, § 9 to CJP § 5–202. Ch. 2, § 1 of the Acts of 1973 (1st Sp.Sess.). When doing so, the General Assembly changed the wording of the statute to its current form. A "Revisor's Note" explained that "[t]his section is new language derived from Art. 57, § [ ]9." *Id.* The preface to the bill further explained that the bill was meant "to revise, restate, and recodify the laws of this State pertaining to courts and proceedings therein. . . ." *Id.* CJP § 5–202 exists unchanged today.

Two years later, in 1975, as part of a recodification of the laws relating to commercial law, the General Assembly repealed Art. 47—the article containing the insolvency laws—, except for Art. 47, §§ 8 and 14, which it recodified in Maryland Code (1975), §§ 15–101–102 of the Commercial Law Article ("CL"). Ch. 49, § 3 of the Acts of 1975. A General Revisor's Note explained:

In revising this subtitle, the Commission to Revise the Annotated Code concluded that the provisions of present

---

6. All other amendments to this statute were stylistic.

Art. 47, except those as revised and not contained in § § 15–101 and 15–102 of this subtitle, are preempted by the Federal Bankruptcy Act. Accordingly, these provisions of Art. 47 are proposed for repeal.

*Id.* A Revisor's Note to § 15–101 further explained:

While Art. 47 is proposed for repeal as obsolete, the two sections of Art. 47 nevertheless are contained elsewhere in the common law, as well as in Art. 23, § [ ]81, and therefore should be retained. This section [15–101] sets forth the law as it has been applied in insolvency proceedings, whether brought pursuant to Art. 23 or Art. 47.

*Id.*

Although obviously belated, the repeal of Art. 47 reflected a recognition of the pervasive role of federal bankruptcy law, the limited role of states in bankruptcy, and the outdated nature of Maryland's insolvency laws. The language of CL §§ 15–101, 15–102, 15–103 recognizes the pervasiveness of the federal bankruptcy statute, and supplements the federal statute with State procedures, but only to the extent not inconsistent with federal bankruptcy law. Other relevant State statutes are consistent with and supplemental to the federal bankruptcy code, such as those discussed in the next paragraph.

Appellant points out that CJP § 5–202 only applies when "a debtor files a petition in insolvency." State laws that interact with federal bankruptcy law define the term insolvency and its variants for state law purposes. Those definitions include, either explicitly or implicitly, insolvency for purposes of bankruptcy under federal bankruptcy law. For example, CL (2002 Repl.Vol.), § 1–201(22) defines "insolvency proceedings" as "any assignment for the benefit of creditors or other proceedings intended to liquidate or rehabilitate the estate of the person involved." [7] Bankruptcy certainly is a proceeding in-

---

7. Prior to the recodification in 1975, this definition existed in Art. 95B, § 1–201(22). The notes to Art. 95B, § 1–201(22) state that it was

tended to liquidate or rehabilitate the debtor's estate. Additionally, CL § 1–201(23) defines an "insolvent" as "[a] person . . . who either has ceased to pay his debts in the ordinary course of business or cannot pay his debts as they become due or is insolvent within the meaning of the federal bankruptcy law." [8] Title 15 of the Commercial Law Article addresses aspects of debt collection. Section 15–101, which addresses preferences in proceedings involving an assignment for the benefit of creditors or receiverships, uses bankruptcy terms, including insolvency and void and voidable preferences, all as defined in the bankruptcy code.

■ If the General Assembly had intended there be no tolling provision, it would have repealed the statute. Instead, unlike almost all of Art. 47, CJP § 5–202 and its predecessors, it survived many legislative sessions and many code revisions, including code revisions in 1939, 1951, 1957, and the more recent codification of CJP. By reenacting the statute and not changing its substance on multiple occasions, we can presume that the General Assembly intended that it remain in effect. Federal bankruptcy law has expanded to include not only traditional bankruptcy but also traditional insolvency proceedings. Moreover, and very relevant to our analysis, is that the policy behind CJP § 5–202 appears to be applicable to bankruptcies. We conclude that the General Assembly, by retaining and reenacting the statute in question, even though it repealed the State insolvency laws, intended CJP § 5–202 to

---

"[n]ew." Art. 95B was created in 1963. Ch. 538, § 1 of the Acts of 1963.

8. Prior to recodification in 1975, this definition existed in Art. 95B, § 1–201(23). The notes to Art. 95B, § 1–201(23), states that it was derived from § 76(3) of the Uniform Sales Act of 1906. Maryland adopted the Uniform Sales Act in 1910, and placed § 76(3) in Art. 83, § 94(3). Ch. 346, § 1, of the Acts of 1910. Art. 83, § 94(3) provided that "[a] person is insolvent within the meaning of this subtitle who either has ceased to pay his debts in the ordinary course of business or cannot pay his debts as they become due, whether he has committed an act of bankruptcy or not, and whether he is insolvent within the meaning of the federal bankruptcy law or not."

include bankruptcy proceedings. If the General Assembly did not so intend, it can amend or repeal the statute.

To be sure, the General Assembly could have amended the tolling provision in question to expressly take into account current insolvency laws and the federal bankruptcy code. It has not, but if we ignored CJP § 5–202, there would be no tolling provision. Maryland's insolvency laws existed for well over 50 years while being largely ineffective, and perhaps unconstitutional. But, when one traces the development of a particular area of the law, it is hard to draw a clear bright line connecting events because crises, changes in perception, political realities, and the need to respond to specific facts and situations as they present themselves, produce reactions and changes in the law that do not always occur with full knowledge and consideration of then existing law. Sometimes there are time lags between the need for a change in the law and the change itself. All areas of the law are not changed at the same time. This sometimes produces incongruities and conflicts, often corrected at a later date. As explained above, we conclude that CJP § 5–202 applies to all insolvency proceedings, including bankruptcy, despite the absence of an express reference to bankruptcy.

Appellant relies on *City of Saco v. Pulsifer,* 749 A.2d 153 (Me.2000), to argue that CJP § 5–202 does not apply to bankruptcy proceedings. In *Pulsifer,* the creditor failed to file a claim during bankruptcy, was not granted a discharge, and consequently was not paid. *Id.* at 154. The creditor sued the debtor post-bankruptcy. *Id.* A Maine statute provided:

If a person is adjudged an insolvent debtor after a cause of action has accrued against him, and such cause of action is one provable in insolvency, the time of the pendency of his insolvency proceedings shall not be taken as a part of the time limited for the commencement of the action.

*Id.* at 155.

The Supreme Judicial Court of Maine noted that the statute was enacted more than one hundred years ago, and the statute remained the same for over one hundred years, while the

bankruptcy laws underwent significant changes. *Id.* The court then noted that, "[u]nder the current federal bankruptcy code, an individual is never 'adjudged an insolvent debtor,' and debts are no longer 'provable in insolvency.'" *Id.* Consequently, the court concluded that

> the language of [the Maine statute] simply does not have meaning in the modern bankruptcy context. Nor is there any authority for importing modern language and modern concepts into this century-old piece of legislation. Even if we were to attempt such a creative interpretation, we would have to make assumptions about legislative intent regarding the need for, and the duration of, a tolling provision. Although there are some similarities in the language and concepts found in both the old Maine Act and the current Federal Code, the [creditor] concedes that "the mechanisms among the statutes differ." These differences are not insignificant to our analysis. For example, the current federal system provides for five distinct categories of bankruptcy-Chapters 7, 9, 11, 12, and 13, whereas the Maine Act provided only one. Additionally, under the Maine Act, the automatic stay was lifted once the debts were discharged. Under the current federal system, however, the automatic stay can be lifted on several different occasions, including (1) when property leaves the estate, (2) when the case is closed, (3) when the case is dismissed, or (4) when the debts are discharged. Moreover, under the current federal system, a creditor may obtain relief from the stay, an option not available under the Maine Act.
>
> More importantly for our analysis today, [the Maine statute], by its own terms, only applies after two conditions are met: (1) a creditor with a claim against the debtor has "proven" that his debts are recoverable, and (2) the debtor has been "adjudged an insolvent debtor." Only after these two conditions are met, would [the Maine statute] toll the statute of limitations. Because the provisions of the current federal system do not require that debts be provable or that a debtor be "adjudged" an insolvent debtor (or even a bankrupt), we are left guessing at when [the Maine statute]

should begin to toll the statute of limitations. We could decide that the filing of a bankruptcy petition would be an appropriate starting point. However, we could also conclude that another date (such as the filing of a reorganization plan, or the first creditor's meeting) triggered the tolling provision.

Similarly, [the Maine statute] provides that the statute of limitations should be tolled during the "pendency of [the] insolvency proceeding." Because there is no "insolvency proceeding" under the current system, however, we are again left to speculate at whether the statute should be tolled during the entire proceeding, or just during the automatic stay, while creditors' rights to sue are actually hindered. Because of the significant conceptual differences between the old Maine law and the current federal law, simply inserting "bankruptcy proceeding" in place of "insolvency proceeding" may not give effect to the legislative purpose supporting [the Maine statute].

*Id.* at 155–56 (citations omitted).

Unlike the Maine statute, we can apply our statute without rewriting it. CJP § 5–202 is narrow, the tolling provision is clear, and it requires only that the debtor's petition be dismissed. The Maine statute required that the person be "adjudged an insolvent debtor" and the action be "provable in insolvency." Neither of those events occur under federal bankruptcy law. In contrast, federal bankruptcy proceedings can be and are dismissed, the case before us being one in point.

## II. *Damages*

Appellant argues that the court erred when it based its judgment "solely on the stipulation in the Bankruptcy Court" because the consent order was vacated by operation of 11 U.S.C. § 349(b).

Section 349(b) provides:

(b) Unless the court, for cause, orders otherwise, a dismissal of a case other than under [11 U.S.C. § 742]—

(1) reinstates—

(A) any proceeding or custodianship superseded under [11 U.S.C. § 543];

(B) any transfer avoided under [11 U.S.C. §§ 522, 544, 545, 547, 548, 549, or 724(a)], or preserved under [11 U.S.C. §§ 510(c)(2), 522(i)(2), or 551]; and

(C) any lien voided under [11 U.S.C. § 506(d)];

(2) vacates any order, judgment, or transfer ordered, under [11 U.S.C. §§ 522(i)(1), 542, 550, or 553]; and

(3) revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case under this title.

We limit our analysis to § 349(b)(2) and § 349(b)(3) because § 349(b)(1) is not relevant, and neither party argues to the contrary.

Generally, § 349(b) reinstates avoided transfers and liens, vacates any judgment entered as a result of the avoidance of a transfer or lien, and revests the property of the estate in the entity in which the property was vested at the commencement of the case. Courts are not in complete agreement as to its meaning, however.

Some courts have interpreted § 349(b) literally, and have refused to vacate orders that were not entered pursuant to one of the statutory sections expressly enumerated in § 349(b)(2). For example, in *In re Searles,* 70 B.R. 266, 268 (D.R.I., 1987), a creditor was in the process of foreclosing on a mortgage granted to him by a debtor and the debtor's wife. The debtor filed for bankruptcy. *Id.* During the bankruptcy, the creditor and the debtor agreed to a consent order. *Id.* The bankruptcy petition was dismissed. *Id.* The debtor failed to fulfill his obligations under the consent order. *Id.* Under the terms of the consent order, the property passed to the creditor. *Id.* The debtor's wife remained on the property, however. *Id.* The creditor moved the bankruptcy court to clarify, instruct and/or reform the consent order to remove the debtor's wife from the property. *Id.* The bankruptcy court reopened the case to hear the motion. *Id.* The court held

"that neither subsection 349(b)(2) nor 349(b)(3) deprives a Consent Order of its binding effect following dismissal of the bankruptcy case." *Id.* at 270. The court explained:

Subsection 349(b)(2) provides that a bankruptcy dismissal vacates orders entered under one of four sections of the Bankruptcy Code. The Consent Order at issue falls under none of the four enumerated sections: 522(i)(1), debtor's right to exempt property; 542, turnover of property to the estate; 550, liabilities of transferee of avoided transfer; and 553, setoff. Therefore, by negative implication, subsection 349(b)(2) provides that the Consent Order was not vacated by the dismissal of Mr. Searles' bankruptcy case.

Subsection 349(b)(3) provides that a bankruptcy dismissal revests the property of the bankruptcy estate in the entity in which it was vested immediately before commencement of the case. The question arises as to whether this applies only to property remaining in the bankruptcy estate at the time of dismissal, or whether it also applies to property that has been distributed to creditors prior to dismissal. The few cases that mention subsection 349(b)(3) refer to its applicability only in the context of property or property rights that have not passed out of the bankruptcy estate. These cases suggest that the "property of the estate" that revests in its prior owners after dismissal includes only the property left in the estate at the time of dismissal. This view is reinforced by the legislative history of subsection 349(b). In a brief discussion of 349(b)'s impact on property that has passed out of the estate prior to dismissal, the legislative history states, "where there is a question over the scope of the subsection, the court will make the appropriate order to protect rights acquired in reliance on the bankruptcy case."

*Id.* at 270 (citations omitted).

Similarly, in *Florida Peach Corp. v. Commissioner of Internal Revenue Service*, during litigation subsequent to a bankruptcy dismissal, the Tax Court had to decide the effect of § 349(b) on a claim allowed by the bankruptcy court prior to

dismissal. 90 T.C. 678, 680–81, 1988 WL 31439 (1988). The Tax Court analyzed the issue as follows.

Section 349(b)(2) of the Bankruptcy Code provides that the effect of a dismissal in bankruptcy is to vacate "any order, judgment, or transfer ordered, under sections 522(i)(1), 542, 550, or 553." The legislative history of section 349(b) provides that the purpose of that section "is to undo the bankruptcy case, as far as practicable, and to restore all property rights to the position in which they were found at the commencement of the case." H. Rept. 95–595, at 5 (1978), *reprinted in* 5 U.S.Code Cong. & Admin. News 5693, 6294 (1978).

It would appear, however, that the impact of section 349(b)(2) of the Bankruptcy Code is limited by the language enumerating the sections to which section 349(b) applies. Opinions by the Bankruptcy Court support this interpretation. In *In re Newton,* 64 B.R. 790 (Bankr.C.D.Ill.1986), the court determined that this limiting language of section 349(b)(2) is "significant" and that the debtor's claim could not be reinstated under that section because the claim did not fall under one of the enumerated sections. An identical result was reached in *In re BSL Operating Corp.,* 57 B.R. 945 (Bankr.S.D.N.Y.1986).

In the present case, respondent's tax claim against petitioner was allowed by the Bankruptcy Court under section 505 of the Bankruptcy Code.... [T]he Bankruptcy Code section involved here is not one of those enumerated in section 349(b)(2) of the Bankruptcy Code, and accordingly, the Bankruptcy Court's judgment allowing the claim of the United States is preserved.

*Id.* at 683–84.

Other courts have interpreted § 349(b) more broadly, and read it as reestablishing the property rights of the parties as they existed at the time that bankruptcy was filed, even if the order in question was not entered under any of the four sections enumerated in § 349(b)(2). For example, in *First Sec. Bank v. Creech,* 858 P.2d 958, 961 (Utah 1993), a farmer

received a loan from the bank. The farmer declared bankruptcy. *Id.* During bankruptcy, the farmer and the bank entered into a stipulation that set forth a new payment schedule and certain requirements for the farmer's business operation. *Id.* The farmer failed to comply with the requirements in the stipulation. *Id.* Subsequently, the bankruptcy petition was dismissed. *Id.* The bank attempted to foreclose. *Id.* The bank argued that the stipulation governed the case. *Id.* The farmer argued that the original loan documents signed before bankruptcy governed the case. *Id.* at 962. The Utah court held that, under 349(b)(3), the original loan documents governed. *Id.* at 963, 965. The court explained:

> Under [section 349(b)(3) ], the property of the estate revested in the elder Creeches upon the dismissal of their case. The question we must now decide is whether the divestiture of their property that occurred upon filing for bankruptcy and the revesting that occurred as a result of the bankruptcy dismissal affected the obligations of the elder Creeches under the terms of the original loan agreements.
>
> We are of the view that any contract rights held by the elder Creeches under the original loan agreements became property of the estate when they filed for bankruptcy and were then revested in the elder Creeches when their bankruptcy case was dismissed. This view is supported by section 541(a) of the Bankruptcy Code, which defines "property of the estate" as all legal and equitable interests of the party filing for bankruptcy. Furthermore, the legislative history of this statute indicates that the scope of this definition is broad: "It includes all kinds of property, including tangible or intangible property." This provision has been interpreted as "all-inclusive," and "sweeping[.]" One court has noted that "an interest is not outside its reach because it is novel or contingent or enjoyment must be postponed." Consistent with this broad definition of "property of the estate," courts generally have held it to include whatever contract rights the debtor holds when the bankruptcy petition is filed.

The contract rights held by the elder Creeches under the original loan agreements at the time of the bankruptcy filing included the right to continue to own and enjoy the collateral securing the loans so long as the terms of the loan agreements were fulfilled. When the elder Creeches filed for bankruptcy, this right and others held by the elder Creeches under the loan agreements became property of the estate.

*Id.* at 963–64 (citations omitted).[9]

Likewise, in *Hilderbrand v. United States*, the debtors obtained a loan from a federal agency, but were unable to meet their obligations under the loan agreement. 905 F.Supp.

---

**9.** A dissenting judge wrote:

Section 349 is a narrow provision interpreted by the courts to apply only to unwind those unique bankruptcy protections specifically referred to: "The courts have refused to extend the reinstatement effect of Section 349(b) beyond its expressly enumerated provisions."

[S]ection 349 generally refers to revesting property of the estate which was brought into the estate by one of the exotic and artificial bankruptcy provisions, such as section 547, "preferential transfers," in the parties which held it prior to the bankruptcy. For example, it is not unknown for a debtor prior to filing bankruptcy to divest himself or herself of property so that it would be out of the reach of creditors, i.e., so that it would not become "property of the estate" upon filing bankruptcy. Another example of a preferential transfer is the preference of one creditor over the others by paying one debt in full before filing bankruptcy. Bankruptcy provides a remedy for this kind of bad faith behavior by empowering the trustee to recoup the property into the property of the estate. The rationale behind the Code's granting such powers to a trustee is that whether property which could potentially be property of the estate is used to pay a single creditor or simply hidden from the reach of creditors, such action results in a diminution of the property of the estate and thus an inequitable distribution to creditors during bankruptcy. Upon dismissal of a bankruptcy, which is essentially a failure of the bankruptcy, the trustee's actions are "unwound." The property goes back to whomever the debtor transferred it to prior to bankruptcy, and the debtor is no longer protected against creditors pursuing their contractual remedies.

The majority cites no cases to support the use of section 349 in the manner it proposes. *In re Nash*, 765 F.2d 1410, 1413 (9th Cir.1985), the only case cited by the majority purportedly supporting its holding, is a chapter 13 case that deals with the issue of the disposition of funds held by a trustee upon dismissal of a bankruptcy.

*Id.* at 968–69 (citations omitted).

774, 777 (E.D.Cal.1995), *aff'd in part and vacated in part on other grounds*, 107 F.3d 16, 1997 WL 51448, 1997 U.S.App. LEXIS 2067 (9th Cir. Feb. 5, 1997). The debtors filed for bankruptcy. *Id.* During the bankruptcy, the debtor and agency agreed to a "Plan of Reorganization." *Id.* The bankruptcy petition was dismissed before the plan was carried out. *Id.* at 781–82. After dismissal, the agency refused to restructure the debt as the agency had agreed in the "Plan of Reorganization." *Id.* at 782. The court held that

> the dismissal of the bankruptcy without approval of the plan is fatal to [the debtors'] claim.... The objective of section 349(b) is to restore all property rights, as far as practicable, to the positions they occupied at the commencement of a case that was dismissed under one of the operative sections of Title 11. Therefore, the dismissal of the bankruptcy without approval of the plan of reorganization means that [the debtors] and the [agency] returned to the status quo prior to the filing of the bankruptcy.

*Id.* at 785 (citations and quotations omitted).

Finally, in *In re Nash*, a debtor filed for bankruptcy, and the creditor filed a claim. 765 F.2d 1410, 1412 (9th Cir.1985). The bankruptcy court allowed the claim, and entered a "Wage Deduction Order" that garnished the debtors' wages. *Id.* The bankruptcy court later dismissed the bankruptcy petition. *Id.* The creditor continued to receive the amounts garnished, however. *Id.* The debtor argued that the "wage deductions had been wrongfully distributed by the Trustee after the [bankruptcy] had been dismissed." *Id.* The Ninth Circuit agreed, explaining that

> a ... dismissal "revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case under this title." The legislative history of § 349(b) states that "the basic purpose of the subsection is to undo the bankruptcy case, as far as practicable, and to restore all property rights to the position in which they were found at the commencement of the case." We have previously stated that § 349 "obviously contemplates that on dismissal a bankrupt is reinvested with

the estate, subject to all encumbrances which existed prior to the bankruptcy."

*Id.* at 1414 (citations omitted).

■ In the case before us, the stipulation and consent order was not filed pursuant to one of the expressly enumerated sections in § 349(b)(2).[10] Nevertheless, we interpret § 349(b) as vacating the stipulation and consent order, at least to the extent that it related to the transfer of title to the equipment and the granting of a security interest in it. The evidence does not reveal the context of the stipulation and order, but it was filed after an unsecured claim and administrative claim were filed. In addition to allowing both claims, the consent order provided for transfer of title to the equipment and the execution of a note and security agreement. The property was in the debtor's estate at the time of the dismissal of the bankruptcy petition. More important, the stipulation and order, by its terms, replaced the obligations under the equipment lease with the obligations contained in the stipulation and order. The stipulation and consent order recognized appellant's "rejection of the Equipment Lease," and provided that "[t]his Stipulation and the Note ... contain the entire agreement between the parties." In summary, the stipulation and consent order clearly affected property rights because it eliminated the parties' obligations under the lease, provided a right to payment, contemplated the transfer of title to the equipment, and granted a security interest in the equipment. By operation of law, § 349(b)(3) reinstated the lease rights and obligations. Thus, the lease determines the nature and extent of appellant's liability.

The court may have treated the stipulation and consent order as tantamount to a settlement agreement supplanting the lease, and premised the damages portion of the opinion on appellant's failure to fulfill his obligations under the stipulation

---

10. 11 U.S.C. § 522(i)(1) governs a debtor's right to exempt property. 11 U.S.C. § 542 governs turnovers of estate property. 11 U.S.C. § 550 addresses the liability of the transferee of an avoided transfer. 11 U.S.C. § 553 governs setoffs.

and consent order. In the "Memorandum and Order of Court," the court stated that "the parties agreed to a general unsecured claim in the amount of $190,725.85," "the parties rejected the lease, by agreement, in August, 2004," and "[t]he parties further agreed that [appellant's] debt to [appellee] was $190[,]725.85" (emphasis added). Furthermore, appellant's breach of the stipulation and consent order was one of appellee's theories of liability, and appellant argued the same in closing argument.

Even if the court did not premise the damages award on noncompliance with the stipulation and consent order, but instead on breach of the lease, we cannot determine whether the court erred in determining the amount. The court did not explain its methodology or identify the components of the award, other than that which is implied by referencing the amount in the stipulation and consent order. Additionally, the court did not address appellant's argument that a damages award should reflect credit for all payments to appellee, including post-petition payments, and it did not address appellee's request for attorneys fees. In the context of this case, ordinarily judges are not required to explain their reasoning, *Beales v. State,* 329 Md. 263, 273, 619 A.2d 105 (1993), and no rule requires trial judges to set forth their mathematical calculation of damages. In this instance, however, we cannot determine the court's methodology and cannot conduct a meaningful review, and thus, we must remand for further proceedings. The court may explain its decision and/or modify its decision in light of this opinion. In its discretion, the court may receive additional evidence. *See Great Coastal Express, Inc. v. Schruefer,* 34 Md.App. 706, 731–32, 369 A.2d 118 (1977). We note that appellant does not challenge the court's conclusion that he breached the lease, and thus, we affirm the finding of liability.

For purposes of proceedings on remand, we note that, although the lease governs the nature and extent of appellant's liability, the stipulation and consent order still has some effect and may be properly considered by the court. Appellee

introduced the stipulation and consent order into evidence without objection, but it was admissible in any event, not to affect property rights, but as an admission of amounts owed. Appellant argues that the court may not consider the stipulation and consent order because appellant did not sign it. Appellant's attorney in the bankruptcy proceeding signed the consent order. A client is bound by the admissions of his attorney of record in the case. *Salisbury Beauty Schools v. State Bd. of Cosmetologists,* 268 Md. 32, 45, 300 A.2d 367 (1973). Thus, the court properly can consider, along with other relevant evidence, the stipulation and consent order as an admission of amounts owed under the lease.

### III. *Prejudgment Interest*

■ As was the case with the damage award, the court did not disclose its method of calculating prejudgment interest, and we are unable to discern it from the record. Again, we are unaware of any case requiring the trial judge to disclose its method of calculating prejudgment interest. Nevertheless, we are unable to uphold the award if we cannot determine the method that the trial judge used in arriving at the amount.

■ Lastly, we note the following:

There are three basic rules governing the allowance of prejudgment interest. Pre-judgment interest is allowable as a matter of right when the obligation to pay and the amount due had become certain, definite, and liquidated by a specific date prior to judgment so that the effect of the debtor's withholding payment was to deprive the creditor of the use of a fixed amount as of a known date. . . . [T]he right to prejudgment interest as of course arises under written contracts to pay money on a day certain, such as bills of exchange or promissory notes, in actions on bonds or under contracts providing for the payment of interest, in cases where the money claimed has actually been used by the other party, and in sums payable under leases as rent. Prejudgment interest has been held a matter of right as well in conversion cases where the value of the chattel converted is readily ascertainable.

On the other hand, in tort cases where the recovery is for bodily harm, emotional distress, or similar intangible elements of damage not easily susceptible of precise measurement, the award itself is presumed to be comprehensive, and pre-judgment interest is not allowed.... Between these poles of allowance as of right and absolute non-allowance is a broad category of contract cases in which the allowance of pre-judgment interest is within the discretion of the trier of fact.

*Buxton v. Buxton,* 363 Md. 634, 656–57, 770 A.2d 152 (2001).

**JUDGMENT VACATED AND CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID ONE–HALF BY APPELLANT AND ONE–HALF BY APPELLEE.**