*Minh-vu Hoang v. Jeffrey Lowery*, No. 17, September Term, 2019, Opinion by Booth, J.

**Courts & Judicial Proceedings – Statutes of Limitations – Tolling Provisions – Petitions in Insolvency**. The tolling provision of the Maryland Code, Courts & Judicial Proceedings Article, § 5-202 applies only to actions that are dismissed by a United States Bankruptcy Court pursuant to the dismissal procedures of Title 11 of the United States Code. There is nothing in the plain meaning of the statute, or the legislative history, its structure or purpose, which would allow us to broadly define the word "dismissal" to include any bankruptcy proceeding that ends in a manner unfavorable the debtor's interest regardless of whether the case is dismissed.

IN THE COURT OF APPEALS

OF MARYLAND

No. 17

September Term, 2019

MINH-VU HOANG

v.

JEFFREY LOWERY

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Greene, Clayton, Jr. (Senior Judge,
Specially Assigned),

JJ.

Opinion by Booth, J.
McDonald and Getty, JJ., dissent.

Filed: June 5, 2020



Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.

Suzanne C. Johnson, Clerk

Perhaps the single most defining feature of federal bankruptcy law in the United States is the ultimate discharge of a person's pre-existing debts. This discharge of indebtedness embodies a deeply-held American ideal—the notion that, despite bad luck or bad judgment, people deserve a second chance to build a life for themselves and contribute to our great national experiment.

Not all insolvent debtors who seek a fresh start receive one, though. The federal bankruptcy court may deny discharge to debtors who commit egregious misconduct in the administration of their cases, such as through acts to defraud their creditors or their court-appointed bankruptcy trustee; to conceal, alter, or destroy records; or to mislead the court. Moreover, entry of an order denying discharge also lifts the stay that federal law provides to shield debtors from actions by their creditors while their bankruptcy cases proceed.

Petitioner Minh-Vu Hoang is an insolvent debtor currently participating in an active bankruptcy case pending before the United States Bankruptcy Court for the District of Maryland. Respondent Jeffrey Lowery is an unsecured creditor of Ms. Hoang who holds a claim in Ms. Hoang's bankruptcy case arising from a judgment he obtained against her in the Circuit Court for Montgomery County in 2002.

Ms. Hoang filed her bankruptcy petition in May 2005 and the matter remains pending. Administration of Ms. Hoang's bankruptcy estate has taken an unusually long time and required a great deal of effort. Foremost, Ms. Hoang held extensive assets through a complex array of entities. Early in the administration of her estate, the bankruptcy court also determined that Ms. Hoang had attempted to hide assets and circumvent federal law.

For those bad acts, the court issued an order denying Ms. Hoang a discharge of indebtedness, forfeiting her right to a fresh start, and lifting the stay on actions against her.

With great difficulty, approximately $19 million of Ms. Hoang's assets have been discovered and claimed by the court-appointed trustee of her bankruptcy estate. Much to the distress of Ms. Hoang's creditors, though, the administration of her estate has generated more than $16 million in legal, accounting, and other related fees.

Sensing that his unsecured claim would not be satisfied when estate funds are ultimately distributed, Mr. Lowery sought to garnish the proceeds of a settlement Ms. Hoang received in 2016 that the bankruptcy court segregated from her bankruptcy estate. Ms. Hoang challenged the writ of garnishment, arguing that Mr. Lowery's judgment had expired under Maryland Code (1974, 2013 Repl. Vol., 2019 Cum. Supp.), Courts & Judicial Proceedings Article ("CJ") § 5-102(a)(3) 12 years from its date of entry because he had not renewed it pursuant to Maryland Rule 2-625. Mr. Lowery argued that CJ § 5-202 (the "Tolling Statute") tolled the time to renew his judgment until after Ms. Hoang's bankruptcy case was finally closed.

The Circuit Court for Montgomery County quashed Mr. Lowery's writ of garnishment. The Court of Special Appeals reversed, holding that CJ § 5-202 tolls the statute of limitations on a claim against a bankruptcy debtor during the pendency of a bankruptcy which results in an "unsuccessful" outcome to the debtor—either through the dismissal of a petition *or*, as in this case, the denial of a discharge but a continuation of the bankruptcy proceeding.

Ms. Hoang filed a petition for writ of *certiorari* with this Court, which we granted

to consider the following question, which we have rephrased and consolidated as follows:

> Did the Court of Special Appeals err in holding that CJ § 5–
> 202 tolls the statute of limitations running on a claim against a
> bankruptcy debtor, from the filing of a bankruptcy petition
> until the closure of the bankruptcy case, where the debtor is
> denied a discharge in bankruptcy, and which does not result in
> a "dismissal" of the bankruptcy proceeding?[1]

We hold that under the plain language of CJ §5-202, the statute does not operate to

toll the statute of limitations on a claim against a bankruptcy debtor that does not result in

a dismissal of the petition. Accordingly, we reverse the judgment of the Court of Special

Appeals.

## I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.      Debt Owed to Mr. Lowery

Mr. Lowery obtained a default judgment against Ms. Hoang in the amount of

$16,987 in the Circuit Court for Montgomery County in April 2002. With interest, Mr.

---

[1] The questions as presented in Petitioner's petition for writ of *certiorari* are as follows:

> 1. Did [the Court of Special Appeals] ignore established
> precedent and rules of statutory construction in holding that the
> tolling statute provided for under Md. Cts. & Jud. Proc. § 5-
> 202 indefinitely tolled, until the closure of the bankruptcy case,
> actions only against debtors denied a discharge in bankruptcy?
>
> 2. Assuming, *arguendo*, that the policy of the tolling statute
> should apply to cases where the debtor is denied a discharge,
> did [the Court of Special Appeals] err in holding (1) that the
> statute applied to the creditor's failure to renew his judgment;
> and (2) that the tolling should continue until the closure of the
> bankruptcy case?

Lowery's judgment totaled over $41,000 by July 2016. In Maryland, a money judgment expires after 12 years, unless it is renewed before it expires. *See* CJ § 5-102(a)(3); Md. Rule 2-625. Under Maryland Rule 2-625, to renew a judgment, Mr. Lowery needed to file a "notice of renewal" with the clerk of the court within the 12-year period, "and the clerk shall enter the judgment renewed." Mr. Lowery did not renew the judgment within the 12-year period, which expired on April 11, 2014. Accordingly, the judgment expired unless the limitations period was tolled.

### B. Ms. Hoang's Bankruptcy

Ms. Hoang filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Maryland in May 2005. In October 2005, Ms. Hoang's bankruptcy case was converted to a liquidation under Chapter 7, and a Chapter 7 trustee was appointed. In March 2006, as a result of Ms. Hoang's attempts to conceal her assets from the government, the bankruptcy court issued an order denying Ms. Hoang a discharge of indebtedness pursuant to 11 U.S.C. § 727. Instead of dismissing Ms. Hoang's bankruptcy case because of her fraudulent and deceitful conduct, the Chapter 7 trustee continued to marshal Ms. Hoang's pre-filing assets for eventual distribution to creditors. The Chapter 7 proceeding is ongoing.

Upon the entry of the bankruptcy court's order denying Ms. Hoang's discharge, unsecured judgment creditors such as Mr. Lowery were no longer barred by the "automatic stay" provisions of 11 U.S.C. § 362(a) that enjoined collection actions against Ms. Hoang. In other words, once the automatic stay expired on March 22, 2006, any impediment under

4

federal bankruptcy law which may have prevented Mr. Lowery from renewing his judgment prior to its 12-year expiration was eliminated.

### C.     2016 Settlement Recovery

In April 2016, Ms. Hoang received $87,000 in the settlement of an unrelated real estate dispute involving a defunct limited liability company ("LLC") of which she was the sole member and manager.  As part of the settlement, the bankruptcy trustee would receive $43,500 and the LLC would receive the remaining $43,500, which would pass directly to Ms. Hoang and remain separate from the bankruptcy estate.  Ms. Hoang's settlement funds were vulnerable to creditor claims because she had been denied a discharge and had lost the protection of the automatic stay.  Mr. Lowery learned of the settlement, and he served Ms. Hoang's attorney (who was holding the settlement funds in escrow) with a writ of garnishment in the amount of $41,294.31 for the 2002 judgment plus interest.

Ms. Hoang moved to quash the writ of garnishment on the basis that Mr. Lowery's judgment was more than 12 years old and had expired pursuant to the 12-year statute of limitations set forth in CJ § 5-102(a)(3).  Ms. Hoang contended that the automatic stay expired on March 22, 2006, when the bankruptcy court denied the discharge, and Mr. Lowery never renewed his judgment, which expired on April 11, 2014, over two years prior to the issuance of the writ of garnishment.  Mr. Lowery responded that his time for renewing the judgment had been extended by operation of CJ § 5-202.  The circuit court agreed with Ms. Hoang and found that CJ § 5-202 did not toll the limitations period on Mr. Lowery's judgment.  Mr. Lowery appealed.

5

### D. Court of Special Appeals

The Court of Special Appeals reversed the circuit court, holding that CJ § 5-202 tolls the statute of limitations for renewing judgments where a debtor's bankruptcy case has been dismissed *or* where the case is *not* dismissed, but the bankruptcy court denies the debtor a discharge pursuant to 11 U.S.C. § 727 and the case continues. In reaching its holding, the Court of Special Appeals reviewed Maryland's insolvency laws enacted in the 1800s and categorized historical insolvency proceedings into "successful" and "unsuccessful" proceedings. Specifically, the court defined a "successful" insolvency under traditional Maryland practice as one in which the debtor's nonexempt assets would be marshalled and distributed to their creditors in exchange for a discharge of their debts. *Lowery v. Hoang*, 240 Md. App. 240, 247–48 (2019). Conversely, the Court of Special Appeals determined that an "unsuccessful" insolvency under traditional Maryland practice was one in which the creditors did not receive the debtor's available assets and the debtor did not receive a discharge. *Id.* at 248. In such cases, Maryland insolvency law preserved creditors' claims and, through operation of the predecessor statute of CJ § 5-202, all parties returned to their pre-petition status. *Id.*

The Court of Special Appeals then similarly characterized the potential outcomes of modern bankruptcy actions under federal law. In the Court of Special Appeals' view, a "successful" bankruptcy action today is one that results in a "closure," after the bankruptcy trustee marshals all of the debtor's nonexempt assets, distributes them to their creditors, and the debtor receives a discharge of remaining indebtedness. *Id.* Likewise, an "unsuccessful" bankruptcy action is one that results in a "dismissal" under the relevant

6

chapter of the Bankruptcy Code, resulting in a dissolution of the automatic stay protection of 11 U.S.C. § 362(a) and a restoration of all parties to their pre-petition statuses. *Id.*

In reaching its holding, the Court of Special Appeals classified Ms. Hoang's denial of discharge as an unsuccessful insolvency. *See Lowery*, 240 Md. App. at 250. The court defined success from the perspective of the debtor, based on whether the debtor receives a discharge and fresh start. *See id.* at 248. After reviewing the legislative history and purpose of CJ § 5-202, the intermediate appellate court determined that the Legislature intended to protect creditors who get tied up in unsuccessful bankruptcies, where the matter concludes but their claims are neither satisfied nor discharged. *Id.* at 250. This way, unscrupulous debtors could not manipulate the insolvency process by filing for bankruptcy, waiting for the statute of limitations to run on their creditors' claims, and then withdraw their petitions or receive a dismissal. *Id.* (quoting *Ali v. CIT Tech. Fin. Servs.*, 416 Md. 249, 268 (2010)). Therefore, the Court of Special Appeals held that the tolling provision of CJ § 5-202 applies to both dismissals and denials of discharge in federal bankruptcy proceedings under Chapter 7, where creditors' claims remain intact after the bankruptcy matter has concluded. *Id.* Under the Court of Special Appeals' holding, CJ § 5-202 will continue to toll the period within which to renew a judgment under Md. Rule 2-625 until Ms. Hoang's bankruptcy case finally concludes, which has been ongoing for over a decade.

Ms. Hoang filed a petition for writ of *certiorari*, which this Court granted.

7

## II.   DISCUSSION

### A. Standard of Review

The Court reviews issues of statutory interpretation *de novo*. *Bd. of Cty. Comm'rs of Washington Cty. v. Perennial Solar, LLC*, 464 Md. 610, 617 (2019) (quoting *Koste v. Town of Oxford*, 431 Md. 14, 25 (2013) ("When an issue involves an interpretation and application of Maryland constitutional, statutory, or case law, an appellate court must determine whether the trial court's conclusions are legally correct under a *de novo* standard of review.")) (internal citations omitted).

### B. Analysis

CJ § 5-202 provides that:

> If a debtor files a petition in insolvency which is later dismissed, the time between the filing and the dismissal is not included in determining whether a claim against the debtor is barred by the statute of limitations.

As set forth below, the Tolling Statute was originally enacted as part of Maryland's insolvency law in 1815.[2]  With the emergence of the modern federal bankruptcy laws, Maryland's tolling statute is one of a few relics of our State's insolvency laws that remain in effect.  As discussed herein, although the General Assembly repealed the State's insolvency law, thereby abolishing Maryland's judicial insolvency proceeding that pre-dated modern federal bankruptcy, it retained a tolling provision that tolls any state statute

---

[2] The predecessor to the Tolling Statute was passed on February 1, 1815, as an amendment to the Act for the Relief of Sundry Insolvent Debtors passed by the General Assembly in the Acts of 1805, ch. 110. Acts of 1814, ch.122 § 2. Although this amendment was adopted in 1815, we shall refer to the Maryland insolvency statute as the 1814 Act because it is included among the statutes enacted with the Acts of 1814.

of limitations that arises between the filing of a "petition in insolvency" and its dismissal. In this case, we are asked to interpret the meaning of "dismissal" or "dismissed" under a tolling provision that refers to an insolvency process that is no longer in existence. Ms. Hoang contends that we should interpret "dismissal" in the same manner as the term is used under the federal Bankruptcy Code. Mr. Lowery contends that we should adopt the reasoning of the Court of Special Appeals and determine that "dismissal" encompasses any bankruptcy action that concludes in a manner that is unsuccessful from the debtor's perspective.

As part of our analysis, it is instructive to briefly review the history of Maryland insolvency law, and its evolution in the context of the emergence of federal bankruptcy laws. Fortunately, the history of the Maryland insolvency statute and its interaction with the later enacted federal bankruptcy statute were summarized in detail by Judge James Eyler in *Ali v. CIT Technology Financing Services, Inc.*, 188 Md. App. 269 (2009), *aff'd* 416 Md. 249 (2010). We shall provide a cursory review of the history that is comprehensively addressed in that opinion.

### *Interplay Between Federal Bankruptcy Laws and Maryland's Insolvency Laws*

#### *Federal Emergence of Bankruptcy Law—Historical Perspective*

Clause 4 of Section 8 of Article I of the United States Constitution gives Congress the power "[t]o establish . . . uniform laws on the subject of bankruptcies throughout the United States." Despite this express grant of authority, for over 100 years after its adoption, the country continued to debate the meaning of the clause and the extent of Congress's power. *Ali*, 188 Md. App. at 278 (citing David A. Skeel, Jr., Debt's Dominion: A History

9

of Bankruptcy Law in America 23–47 (2001)). Throughout the 1800s, a pattern emerged where Congress would enact a bankruptcy law during a period of recession or depression, only to have the law repealed during a time of prosperity. *Ali*, 188 Md. App. at 278–79.

"All the while, states enacted insolvency laws, generally granting rights to debtors, to fill the void left by the lack of a national bankruptcy law." *Id.* at 278 (*citing* Skeel, *supra*, at 24–28). It was clear by the late 1800s that many state insolvency laws violated the Constitution's prohibition against state "laws impairing the obligations of contracts . . . ." *See id.* at 281; U.S. Const. art. I, § 10. "Nevertheless, despite that and preemption issues, many state insolvency laws remained active simply because they were not challenged." *Ali*, 188 Md. App. at 281 (citation omitted).

Following the financial crisis of 1893, Congress enacted the first permanent federal bankruptcy system with the Bankruptcy Act of 1898 (also known as the "Nelson Act"), which applied to all classes of debtors and provided for involuntary and voluntary bankruptcy. *Id.* (citations omitted). Shortly thereafter, the Supreme Court made it clear that Congress possessed plenary power over bankruptcies, which was broadly defined. *Id.* (citing *Hanover Nat'l Bank v. Moyses*, 186 U.S. 181 (1902)). Since then, bankruptcy law has been stable, although it has been repealed and replaced on several occasions, most notably in the 1930s and 1970s. *Ali*, 188 Md. App. at 281 (citations omitted).

### The Early Maryland Insolvency Act

During the period of ebb and flow of federal bankruptcy laws, between 1805 and 1975, Maryland enacted insolvency laws that provided for the discharge of debts. Under the Act for the Relief of Sundry Insolvent Debtors, enacted by the General Assembly with

10

the Acts of 1805, ch. 110 (the "1805 Insolvency Act"), a debtor's nonexempt assets were gathered, turned over to a court-appointed trustee, and eventually distributed to creditors. Acts of 1805, ch. 110, §§ 3–5. If the debtor complied with the requirements of the 1805 Insolvency Act and all other procedures were followed, the debtor would receive a discharge of debts and a fresh start. *Id.* at § 5. Not all debtors received a fresh start. Like modern federal bankruptcy laws, the 1805 Insolvency Act also provided for the denial of discharge for misbehaving debtors, stating that debtors who attempted to defraud their creditors or committed various other forms of misconduct in the course of insolvency proceedings would be "for ever [*sic*] precluded from any benefit of this act. . . ." *Id.* at § 9.

The Tolling Statute has its origins in the General Assembly's 1814 amendments to the 1805 Insolvency Act. Acts of 1814, ch. 122 ("1814 Act"). The 1814 Act had three sections. Section 1 of the 1814 Act "limited the ability of courts to continue pending petitions from one court session to another." *Ali*, 188 Md. App. at 283. Section 2 of the statute addressed renewals of judgment, providing that, "upon *dismissal or withdrawal of a petition, or a decision adverse to petitioner*, it was not necessary for a creditor to revive any judgment suspended by the petition."[3] *Id.* (Emphasis added). Under the plain language in section 2, judgments that could not be enforced during the pendency of an insolvency action were automatically valid and enforceable upon dismissal, withdrawal, or a decision

---

[3] Specifically, section 2 of the 1814 Act provided that "upon the dismissal or withdrawing of any petition for the benefit of said acts, or upon decisions thereon against the petitioner, it shall not be necessary to revive by *scire facias* any judgment which may have been suspended by such petition [in insolvency], and process of execution may be issued upon such judgments as if no such suspension had taken place." Acts of 1814, ch. 122, § 2.

11

adverse to petitioner. The language of the 1814 Act contains similarities to modern federal bankruptcy law. Like the federal Bankruptcy Code, which distinguishes between a dismissal of a petition and a denial of discharge, the language of the 1814 Act reflects that the "dismissal" of an insolvency petition was different from a "decision adverse to [a] petitioner."

Section 3 of the 1814 Act contains the first iteration of the Tolling Statute, providing "[t]hat the time intervening between the petitioning of any of said debtors and the time that any of said petitions may be dismissed, shall not be computed on any plea of limitation so as to defeat any claim of any person against such debtor." Acts of 1814, ch. 122 § 3. In short, section 3 tolled any statute of limitations running on any claim against a debtor from the filing of the insolvency petition to its dismissal where a petition was dismissed.

Significantly, the language in section 2 and section 3 contain a key distinction that assists with our statutory analysis of the current statute. Like the current Tolling Statute, section 3 of the 1814 Act only tolled the statute of limitations where a petition was "dismissed." By contrast, the automatic reinstatement of judgments under section 2 occurred "upon the dismissal or withdrawing of any petition for the benefit of said acts, or upon decisions thereon against the petitioner, . . . ." Acts of 1814, ch. 122, § 2. By the plain terms of the 1814 Act, the General Assembly established automatic reinstatement of judgments in the event of dismissal, withdrawal, or denial of discharge, but granted tolling only in the event of dismissal of the petition.

12

*Modern Revisions to Maryland's Insolvency Laws*

When the General Assembly first consolidated the State's laws into the Maryland Code of 1860, it codified the vast majority of the insolvency laws in Article 48. *See* Md. Code, Art. 48 (1860). The General Assembly later moved the insolvency laws to Article 47, where they remained until 1975. *Ali*, 188 Md. App. at 284. However, the Legislature located the Tolling Statute in Article 57, with the other limitations statutes. *See* Md. Code, Art. 57, § 8 (1860). The Court of Special Appeals summarized the legislative history of the Tolling Statute in *Ali* as follows:

> At some point prior to 1860, the General Assembly slightly changed the wording of the provision to read: "The time intervening between the petitioning of an insolvent debtor, and the time when his petition may be dismissed, shall not be computed on any plea of limitation so as to defeat the claim of any person against such debtor." *See* Maryland Code of 1860, Art. 57, § 8. At a later point, the General Assembly moved this provision to Art. 57, § 9.
>
> Art. 57, § 9 remained unchanged until 1973, when the General Assembly recodified Art. 57, § 9 to CJ[] § 5-202. Ch. 2, § 1 of the Acts of 1973 (1st Sp.Sess.). When doing so, the General Assembly changed the wording of the statute to its current form. A "Revisor's Note" explained that "[t]his section is new language derived from Art. 57, § [] 9." *Id.* The preface to the bill further explained that the bill was meant to "revise, restate, and recodify the laws of this State pertaining to courts and proceedings therein . . . ." *Id.* CJ[] § 5-202 exists unchanged today.

*Ali*, 188 Md. App. at 284.

Two years later, in 1975, as part of the recodification of the commercial laws into our current Commercial Law Article, the General Assembly repealed the insolvency laws set forth in Article 47. The only insolvency law provisions that were recodified consisted

13

of former-Article 47 §§ 8 and 14, which involve preferences and priorities in insolvency. Those sections were recodified in Maryland Code (1975), §§ 15–101, 15–102 of the Commercial Law Article ("CL"). Acts of 1975, ch. 49, § 3. A General Revisor's Note explained:

> In revising this subtitle, the Commission to Revise the Annotated Code concluded that the provisions of present Art. 47, except those revised and not contained in §§ 15–101 and 15–102 of this subtitle, are preempted by the Federal Bankruptcy Act. Accordingly, these provisions of Art. 47 are proposed for repeal.

A Revisor's Note to § 15-101 further explained:

> While Art. 47 is proposed for repeal as obsolete, the two sections of Art. 47 nevertheless are contained elsewhere in the common law, as well as in Art. 23, § [] 81, and therefore should be retained. This section [15-101] sets forth the law as it has been applied in insolvency proceedings, whether brought pursuant to Art. 23 or Art. 47.

As the Court of Special Appeals explained in *Ali*, "[a]lthough obviously belated, the repeal of Art. 47 reflected a recognition of the pervasive role of federal bankruptcy law, the limited role of states in bankruptcy, and the outdated nature of Maryland's insolvency laws." 188 Md. App. at 285.

As part of the recodification of the limited sections of former-Article 47 involving preferences of creditors, the General Assembly recognized the preemptive nature of the federal bankruptcy laws and incorporated by reference specific provisions of the Bankruptcy Act as part of the recodification.[4] Title 15 of the Commercial Law Article

---

[4] *See* Revisor's Note to CL § 15–101, explaining that subsection (d), pertaining to the rights of an assignee for the benefit of creditors or a receiver of the insolvent's assets,

14

addresses aspects of debt collection. Section 15-101, which addresses preferences in proceedings involving an assignment for the benefit of creditors or receiverships, uses bankruptcy terms, including "insolvent" and "void" and "voidable" preferences, all as defined in the Bankruptcy Code. The current version of CL § 15-101 sets forth definitions of words "as used in federal bankruptcy laws." *See* CL § 15-101(a). CL § 15-101(a)(11) contains a "catchall" provision, which provides that: "Other words, including 'insolvent' and 'insider', when used in federal bankruptcy law shall have the meanings set forth in the definition section of the federal bankruptcy law or as interpreted by the federal courts applying the federal bankruptcy law." The only remnants of the historic insolvency laws, codified at CL §§ 15-101, 15-102 and 15-103, recognize the pervasiveness of the federal bankruptcy statute and supplement the federal statute with State procedures, including some definitions, but only to the extent not inconsistent with federal bankruptcy law.

To summarize, in 1975, all of Maryland's insolvency laws were repealed, with the exception of the above-described provisions of Title 15 of the Commercial Law Article addressing aspects of debt collection. Despite the repeal of the historical insolvency laws, which had been preempted by the federal Bankruptcy Code, the Legislature kept intact the Tolling Statute, CJ § 5-202, which provides a tolling of the pertinent statute of limitations on claims against the debtor for a period between the "filing and the dismissal" of a petition for insolvency.

---

"is derived from the Bankruptcy Act . . . and [has] been incorporated by reference . . . but [is] particularly set forth within the section to avoid problems with respect to incorporation by reference of entire bodies of federal law." Acts of 1975, ch. 49 § 3.

15

In *Ali v. CIT Technology Financing Services, Inc.*, 416 Md. 249 (2010), this Court was asked to determine whether, under the plain language of the Tolling Statute, the phrase "petition in insolvency" included a federal bankruptcy petition. Despite the fact that the Tolling Statute dates back to the early Republic and predated the enactment of modern federal bankruptcy laws, after considering the plain meaning, legislative history, and legislative purpose of CJ § 5-202, we held that "a federal bankruptcy petition constitutes a 'petition in insolvency' and the Tolling Statute therefore, "operated to toll any applicable statute of limitations from the time the debtor . . . filed his federal bankruptcy petition until the time that petition was dismissed." *Id.* at 271. In analyzing the statute, this Court considered the same legislative history outlined above, and also considered the plain language of the statute by consulting various 19th century legal and general dictionary definitions of "insolvency" and "insolvent." *Id.* at 262–63.

In addition to considering the plain meaning of the phrase during the early 19th century, the Court also looked at the legislative history during the 1963 adoption of the Uniform Commercial Code. *Id.* at 264. As part of that code adoption, this Court noted that the General Assembly adopted a definition for the term "insolvent," which it defined as one "who either has ceased to pay his debts . . . as they become due or is insolvent within the meaning of the federal bankruptcy law.'" *Id.* (citing CL § 1-201(23)). We further commented that 10 years later, in 1973, the Tolling Statute was recodified for the last time, moving from Art. 57 § 9 to CJ § 5-202. *Id.* We explained that, "had the legislature, during its recodification process, desired an alternative definition, it would have enacted one. Its

16

silence, however, informs us that the Legislature was content with the definition as codified in the Commercial Law Article." *Id.*

We concluded that, "at the time that the [predecessor to the Tolling Statute] was enacted, it was understood that a 'petition in insolvency' was a petition filed by one in relation to his or her inability to pay off his or her debts in full." *Id.* at 264. We explained that, "It seems incontrovertible that the filing of a Chapter 11 federal bankruptcy petition is [also] a petition by one in relation to his or her inability to pay off his or her debts in full." *Id.* at 265. Accordingly, we determined that modern day bankruptcy fits "squarely within § 5-202's definition of 'petition in insolvency.' As such, a plain-meaning analysis . . . compels the conclusion that the filing of a federal bankruptcy petition operates to toll Maryland's generally-applicable three-year statute of limitations." *Id.* at 266.

In addition to undertaking a plain meaning analysis, we also reviewed the legislative history and purpose underlying the tolling provision and concluded that the "Legislature presumably intended for § 5-202 to apply to what was once segmented into 'bankruptcy' and 'insolvency' proceedings, and to what is now predominantly under the purview of federal bankruptcy law." *Id.* at 267.

Finally, we turned to the public policy behind the tolling provision, which buttressed our conclusion. We agreed with the Court of Special Appeals' analysis that, like the default federal tolling provision in 11 U.S.C. § 108, the state tolling provision contained in CJ § 5-202 "was enacted 'to address the public's complaint that debtors manipulated the bankruptcy and insolvency processes to avoid paying creditors by entering bankruptcy,

17

waiting for the statute of limitations to expire, and subsequently dismissing the bankruptcy proceeding.'" *Id.* at 268 (quoting *Ali*, 188 Md. App. at 283–84) (citations omitted).

Having concluded in *Ali* that the tolling provision in CJ § 5-202 applies to the filing of a federal bankruptcy petition, we must determine whether the word "dismissal" has the same meaning as the term is used under the modern federal Bankruptcy Code, or whether it means something different, such as the broad definition supplied by the Court of Special Appeals, to encompass all "unsuccessful" bankruptcies, which do not result in a discharge of the debtor's pre-petition debts. As part of our analysis, it is instructive to consider the manner in which the federal Bankruptcy Code uses the term "dismissal" as well as the term "denial of a discharge."

> *Modern Federal Bankruptcy Laws—The Automatic Stay, Dismissal of a Petition, Denial of Discharge*

A bankruptcy case begins when a debtor files a petition under the applicable chapter of Title 11 of the "Bankruptcy Code with the appropriate federal bankruptcy court. 11 U.S.C. § 301(a); § 302.[5] Commencing a bankruptcy case creates an estate (the "bankruptcy estate" or "estate") comprised of the debtor's assets as established under 11 U.S.C. § 541, by which all of the debtor's property becomes the property of the estate except for that

---

[5] Creditors may initiate involuntary bankruptcy proceedings under 11 U.S.C. § 303, but they are exceedingly rare—a report by the Administrative Office of the United States Courts shows that they represented less than one-tenth of one percent of all bankruptcy cases between 1990 and 2016. Administrative Office of the United States Courts, Judicial Facts and Figures, Table 7.2, https://www.uscourts.gov/sites/default/files/data_tables/jff_7.2_0930.2016.pdf (Perma.cc: https://perma.cc/ZN4S-R53S).

18

which the Bankruptcy Code exempts. The estate is represented by a trustee who has the capacity to sue and be sued. 11 U.S.C. § 323.

Chapter 7 of the Bankruptcy Code governs cases in which the debtor's assets are to be liquidated and then distributed to creditors rather than reorganized and their debts restructured. The trustee administers the estate for the benefit of the debtor's creditors; in the case of a liquidation under Chapter 7, this broadly includes marshalling and liquidating the assets of the estate for distribution to creditors. *See* 11 U.S.C. § 704. Only creditors with an allowed claim under 11 U.S.C. § 502 may participate in the case. Creditors receive assets distributed from the estate (to the extent that they exist) pursuant to established priority rules.

The filing of a petition operates as a stay (the "automatic stay") of actions against the debtor. *See* 11 U.S.C. § 362(a). The automatic stay applies to several types of actions, including "the commencement or continuation" of an action "to recover a claim against the debtor"; enforcement against the debtor or property of the bankruptcy estate of a judgment obtained pre-filing; and any act to obtain possession of property of the bankruptcy estate or from the estate or to exercise control over the property of the estate. 11 U.S.C. § 362(a)(1)–(3). The automatic stay offers strong protection to debtors and applies in all but a select set of circumstances. *See* Elizabeth Warren, Chapter 11: Reorganizing American Businesses 27–30 (2008). The automatic "stay 'is designed to provide breathing space to the debtor, prevent harassment of the debtor, assure that all claims against the debtor will be brought in the sole forum of the bankruptcy court, and protect creditors as a class from the possibility that one or more creditors will obtain payment to the detriment

19

of others.'" *In re Swintek*, 906 F.3d 1100, 1103 (9th Cir. 2018) (quoting *Burton v. Infinity Capital Mgmt.*, 862 F.3d 740, 746 (9th Cir. 2017)).

Section 362(c)(2) of the Bankruptcy Code identifies three instances when, by operation of law, the automatic stay terminates in a bankruptcy case: (1) "the time the case is closed"; (2) "the time the case is dismissed"; or (3) "the time a discharge is granted or denied" in a case under Chapter 7.  *See* 11 U.S.C. § 362(c)(2).  Creditors may also petition for relief from the automatic stay under 11 U.S.C. § 362(d).

The Bankruptcy Code uses distinct terms to describe multiple possible ends to a bankruptcy action.  As set forth below, under the federal bankruptcy scheme a "dismissal" of a bankruptcy petition does not encompass all "unsuccessful" bankruptcies, as that concept was devised by the intermediate appellate court in this case.

The bankruptcy court "close[s]" what the Court of Special Appeals referred to as "successful" bankruptcy actions.  *See* 11 U.S.C. § 350(a) ("After an estate is fully administered and the court has discharged the trustee, the court shall close the case.").  In this instance, the creditors recover from available funds at their level of priority while the debtor receives a discharge of remaining debts and a fresh start.

By contrast, a bankruptcy can end "unsuccessfully" by a "dismissal" of the action. *See* 11 U.S.C. § 707(a) (providing for the dismissal of a Chapter 7 bankruptcy); § 1112(b)(1) (providing for the dismissal of a Chapter 11 bankruptcy); § 1307(b) (providing for the dismissal of a Chapter 13 bankruptcy)).  Under Chapter 7, the court may dismiss a case for cause, including if the debtor causes unreasonable delay that prejudices

their creditors, does not pay required fees, or fails to file required information. 11 U.S.C. § 707(a).

If a bankruptcy case is dismissed, the debtor does not receive a discharge. Instead, "the automatic stay is dissolved and dismissal 'restores the assets and the parties to their prepetition status, as if the case had never been filed.'" *Lowery*, 240 Md. App. at 248 (citing *In re Woodhaven, Ltd.*, 139 B.R. 745, 748 (Bankr. N.D. Ala. 1992)).

As the Court of Special Appeals noted, a third option exists in the federal system, which is referred to as a "denial of discharge." 11 U.S.C. § 727(a). Denial of discharge is an extreme sanction—it is "akin to financial capital punishment. It is reserved for the most egregious misconduct by a debtor." *In re Tauber*, 349 B.R. 540, 545 (Bankr. N.D. Ind. 2006). If the bankruptcy court issues an order denying the debtor a discharge, the debtor remains liable for any unsatisfied debts after the closure of the case. This is what occurred here. Ms. Hoang originally filed her case under Chapter 11, and the matter was converted to a Chapter 7 case on October 28, 2005. On March 22, 2006, the bankruptcy court entered an order denying Ms. Hoang a discharge in bankruptcy. *See* 11 U.S.C. §§ 707(b), 1112(b)(1) (where a bankruptcy court has denied a discharge, the bankruptcy court has the option of dismissal of the case, or conversion to Chapter 7, whichever is in the best interests of creditors and the bankruptcy estate). In connection with Ms. Hoang's denial of a discharge, the bankruptcy court did not dismiss her case—instead, the Chapter 7 proceeding continued, with Chapter 7 trustee undertaking efforts to marshal and liquidate her assets, rather than re-vesting those assets in Ms. Hoang, as if the case had never been filed, and without the benefit of a discharge.

21

Importantly for unsecured creditors such as Mr. Lowery, when the court denied Ms. Hoang a discharge, the automatic stay was lifted and there was no impediment under the Bankruptcy Code that enjoined collection actions against Ms. Hoang. *See* 11 U.S.C. § 362(c)(2).

> *Interplay Between Tolling Provisions Under Federal Bankruptcy Law and State Law*

Finally, as the last piece of our statutory analysis, it is important to analyze our Tolling Statute within the context of the federal bankruptcy tolling provisions set forth in § 11 U.S.C. § 108(c), which provides as follows:

> (c)     Except as provided in [11 U.S.C. § 524], *if applicable nonbankruptcy law*, an order entered in a nonbankruptcy proceeding, or an agreement *fixes a period for commencing or continuing a civil action in a court other than a bankruptcy court on a claim against the debtor*, or against an individual with respect to which such individual is protected under [11 U.S.C. §§ 1201, 1301], and such period has not expired before the date of the filing of the petition, then such period does not expire until the later of—
>
> > (1) *the end of such period, including any suspension of such period occurring on or after the commencement of the case; or*
> >
> > (2) 30 days after notice of the termination or expiration of the stay under [11 U.S.C. §§ 362, 922, 1201 or 1301], as the case may be, with respect to such claim.

(Emphasis added). In essence, subsection (c) provides that if state law fixes a period for commencing a civil action in a nonbankruptcy court against a debtor, and the period has not expired before the date of filing of the petition in bankruptcy, then the period does not

expire until the later of (1) the end of that period, including any suspension of such period occurring on or after the commencement of the case, or (2) 30 days after the stay is lifted.[6]

In this instance, assuming that the automatic stay applied to the renewal of Mr. Lowery's judgment under the federal tolling provision,[7] once the stay was lifted in March

---

[6] As the Court of Special Appeals noted in *Ali v. CIT Technology Financing Services, Inc.*, 188 Md. App. 269, 282 (2009), courts that have interpreted 11 U.S.C. § 108 "are not in agreement as to its meaning, specifically, whether it tolls a statute of limitations during the existence of a stay with a minimum of thirty days after the stay is lifted, *e.g.*, *Kertesz v. Ostrovksy*, 115 Cal. App. 4th 369 (2004), or whether it does not toll but provides a minimum of thirty days after a stay is lifted. *E.g.*, *National Bank of Commerce Trust & Savings Ass'n*, 256 Neb. 679 (1999)." *Ali*, 188 Md. App. at 282. We do not need to wrestle with this issue because the outcome of this case turns on our interpretation of CJ § 5-202. Mr. Lowery's attempt to renew his judgment is untimely under any interpretation of 11 U.S.C. § 108(c) unless under CJ § 5-202, the period of limitations is tolled until the "conclusion" of the bankruptcy proceeding. We approach with caution the complexity of interpreting the Bankruptcy Code and its interplay with state law. Because it is unnecessary to interpret the meaning of the Bankruptcy Code beyond our Tolling Statute for purposes of resolving the issue presented in this case, we limit our holding to the application of the Maryland statute.

[7] We also note that there is a split in authority in the federal circuits over whether a renewal of a judgment violates the automatic stay. *Compare In re Smith*, 352 B.R. 702, 707 (B.A.P. 9th Cir. 2006) (holding, upon the resolution of a certified question to Arizona's Supreme Court, that the renewal of a judgment under Arizona law is a ministerial act not implicated by the automatic stay) *with In Re Lobherr*, 282 B.R. 912 (Bankr. C.D. Cal. 2002) (holding that California's statutory scheme for renewing judgments more closely resembles a judicial action or proceeding included within the acts prohibited by the automatic stay). In Maryland, the process of renewing judgments under Maryland Rule 2–625 is ministerial in nature in that it requires no notice to the debtor and is simply accomplished by an entry by the clerk of the court upon a notice of a renewal. *Cf. W.D. Curran & Assocs., Inc. v. Cheng Shum Enters., Inc.*, 107 Md. App. 373 (1995) (holding that the act of renewing an expiring execution lien is a ministerial act not stayed by the filing of a bankruptcy petition). However, we do not need to decide whether the automatic stay prevents the renewal of a state court judgment and decline to provide our interpretation of a federal statute on which federal bankruptcy courts are split. In this case, Mr. Lowery had until April 11, 2014 to renew his judgment—over eight years after the automatic stay was lifted. There was ample time within which he could have renewed the judgment

2006, Mr. Lowery was free to renew his judgment at any time. Because Mr. Lowery did not renew his 2002 judgment during the ensuing years between March 2006 and the expiration of the judgment in April 2014, the only way his judgment is effective is if we hold that CJ § 5-202 operated to toll the requirement that he renew his judgment until Ms. Hoang's pending bankruptcy is concluded.

For the reasons set forth below, we hold that a broad interpretation of the word "dismissal" as meaning the conclusion or termination of an "unsuccessful" bankruptcy, regardless of whether the proceeding is in fact dismissed, is inconsistent with the plain language of the Tolling Statute, its structure and purpose, and its legislative history. Additionally, in *Ali*, 416 Md. 249, we construed the plain language of the Tolling Statute in a manner consistent with the federal Bankruptcy Code. We see no reason to interpret the Tolling Statute any differently in this instance by supplying a meaning to the word "dismissal" that is inconsistent with the plain language, particularly considering its limited, if not exclusive, application to federal bankruptcy petitions, after the repeal of State laws concerning judicial insolvency proceedings.

### Under the Plain Language of CJ § 5-202, "Dismissal" Does Not Embrace All "Unsuccessful" Bankruptcy Petitions

As discussed above, this case requires us to examine the plain meaning of a single word—"dismissal"—in the context of a body of law enacted over 200 years ago, the majority of which has been repealed for decades.

---

irrespective of whether he was precluded by the automatic stay from doing so prior to March 2006.

24

Under our case law addressing statutory analysis, the "ultimate objective of our analysis is to extract and effectuate the actual intent of the Legislature in enacting the statute." *Goshen Run Homeowner's Ass'n, Inc. v. Cisneros*, 467 Md. 74, 107–08 (2020) (quoting *Reier v. State Dep't of Assessments & Taxation*, 397 Md. 2, 26 (2007) (additional citations omitted). "This begins with an examination of the plain language of the statute." *Id*. "If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the statute as written without resort to other rules of construction." *Lockshin v. Semsker*, 412 Md. 257, 275 (2010) (citations omitted). However, we do not analyze statutory language in a vacuum. *Id.* Rather, statutory language "must be viewed in the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Id.* at 276. "Where the language is ambiguous and may be subject to more than one interpretation, however, we look to the statute's legislative history, case law, purpose, structure, and overarching statutory scheme in aid of searching for the intention of the Legislature." *Koste v. Oxford*, 431 Md. 14, 26 (2013) (citing *Whitley v. Md. State Bd. of Elections*, 429 Md. 132, 149 (2012) (additional internal citations omitted)).

Based upon our review of the plain language of the 1814 Act, the word "dismissal" did not include all "unsuccessful" insolvency petitions. As noted above, section 3 of the 1814 Act, the statute of limitations was only tolled where the insolvency petition was "dismissed." By contrast, under section 2, the Act permitted the automatic reinstatement of judgments in the event of dismissal, withdrawal, or a "decision[] thereon against the petitioner." Comparing the language of these two sections of the 1814 Act, it is clear that

25

all unsuccessful insolvency petitions were not treated the same. The Legislature did not treat a "dismissal" of an insolvency petition in the same manner as a "decision . . . against the petitioner." Had the Legislature intended to treat the actions synonymously, it would not have drawn distinctions between the two events in the language of the statute. Based upon our reading of the 1814 Act, it appears that "dismissal" as that term was used in the Act had a meaning similar to "dismissal" under the modern Bankruptcy Code. In other words, the term "dismissal" did not encompass all bankruptcy cases which ended in a manner unfavorable to the debtor's interests.

Our plain language interpretation of "dismissal" is consistent with the ordinary and popular meaning of the term as reflected in the contemporary dictionary definitions of that era. "In seeking to apply the plain[ ]meaning rule, it is proper to consult a dictionary or dictionaries for a term's ordinary and popular meaning. In choosing the dictionary or dictionaries from which to glean assistance, we consult those editions (in addition to current editions) of dictionaries that were extant at the time of the pertinent legislative enactments." *Ali*, 416 Md. at 262 (internal citations omitted) (cleaned up).

A review of various 19th century legal and general dictionaries defined "dismissal" as follows:

- Dismiss: "to send away, discard." Dismissed: "sent away, discharged." JOHNSON'S DICTIONARY OF THE ENGLISH LANGUAGE (1st ed. 1804).

- Dismiss: "to send away; to discard." SHERIDAN IMPROVED. A GENERAL PRONOUNCING AND EXPLANATORY DICTIONARY OF THE ENGLISH LANGUAGE (9th ed. 1804).

26

- To Dismiss a cause: "A term used in chancery courts for removing a cause out of court without any further hearing." BOUVIER'S LAW DICTIONARY, ADAPTED TO THE CONSTITUTION AND LAWS OF THE UNITED STATES OF AMERICA, AND OF THE SEVERAL STATES OF THE AMERICAN UNION (2nd 1843).

The above definitions make clear that at the time of the enactment of the 1814 Act and while it was in effect, a dismissal of an insolvency proceeding meant the discarding of a petition. There is nothing in the plain language of the 1814 Act, as well as the dictionary definitions that existed at the time of enactment, which would otherwise cause us to conclude that the word "dismissal" was ambiguous, or that it was intended to broadly encompass all unsuccessful bankruptcy petitions. Such a strained interpretation would be inconsistent with its plain and unambiguous meaning.

The Dissent takes issue with our plain meaning analysis, contending that when sections 1, 2, and 3 of the Insolvency Act are read together, "there is little doubt that [section] 3 was meant to encompass at least a withdrawal of a petition – what otherwise might be called a voluntary dismissal – as well as an involuntary dismissal." *See* Dissent Slip Op. at 4. The Dissent asserts that a plain reading of "dismissal" is inconsistent with purpose of the statute. *Id.* We disagree.

Assuming, for the sake of argument, that we accepted the Dissent's broad interpretation of the word "dismissal" under the 1814 Act as encompassing *all* withdrawn or dismissed petitions, here, we are not being asked to examine a "withdrawal" or a "dismissal" of a bankruptcy case. Rather, we are being asked to apply the term "dismissal"

27

to the *opposite scenario*—where the bankruptcy court takes the express action *not* to "dismiss" or dispose of the case.

"Dismissal" is a specific procedural action which disposes of a case without adjudication on the merits. Similarly, a "withdrawal" of a petition accomplishes the same result— the case is terminated without final adjudication. In either instance, the key feature is that, after dismissal or withdrawal, the case is over. By contrast, as set forth below, the denial of a discharge does not dispose of a case and does not generate a procedural outcome that is in any way analogous to a "dismissal" or a "withdrawal."[8] Here, the denial of a discharge resulted in active ongoing bankruptcy proceeding that remains ongoing 14 years later and counting.

Taking it a step further, even if we accept the Dissent's expansive interpretation of "dismissal" under sections 2 and 3 of the 1814 Act in the context of the historic insolvency proceeding, such an expansive interpretation still does not support stretching the term to encompass to a *modern-day bankruptcy proceeding* that does not conclude in a timely fashion. As the Dissent points out, under section 1 of the 1814 Act, insolvency proceedings were tied to court sessions and were limited in duration.[9] Dissent Slip. Op. at 2–3.

---

[8] We discuss the alternative interpretation of "dismissal" advanced by the Dissent which encompasses "withdrawn" and "dismissed" proceedings not because we agree with the Dissent's interpretation under our plain meaning analysis, but to illustrate how even a broad interpretation under 1814 Act falls short of an expansive interpretation that could be applied to a modern bankruptcy proceeding that is not dismissed.

[9] Section 1 of the Act provided:

> That no petition for the benefit of the original act for the benefit
> of sundry insolvent debtors, and the several supplements

28

Interpreting "dismissal" to include a modern day "non-dismissal" of a bankruptcy proceeding, which results in the tolling of claims against a debtor for over a decade, is inconsistent with the structure of the 1814 Act, which imposed a limited time-frame or duration on insolvency proceedings. As described *infra*, such an expansive interpretation, which allows for the tolling of claims for over a decade, is also inconsistent with our jurisprudence requiring that we narrowly construe statutes of limitations. *See Ceccone v. Caroll Home Services, LLC*, 454 Md. 680, 691 (2017); *Garay v. Overholtzer*, 332 Md. 339, 359 (1993).

We also disagree with the Dissent that our interpretation of the word "dismissal," which is rooted in its plain language and common and ordinary meaning, is "inconsistent with the purpose of the statute[.]" Dissent Slip. Op. at 3. Unlike a dismissal or withdrawal, which are capable of manipulation by a debtor, as set forth *infra*, under a modern-day denial of a discharge, the debtor is stripped of all control and is incapable of manipulating the bankruptcy process for the purpose of waiting for creditor claims to run.

There is nothing in the plain language of the 1814 Act that supports an interpretation of the word "dismissal" to include a "non-dismissal"—the denial of a discharge that results

---

thereto, now depending in any of the county courts of this state shall be continued beyond the second session of such court next after the passage of this act; unless in cases where the court shall be satisfied that a further continuance is necessary to procure testimony material and competent on the trial of any allegations made against the petitioner's discharge, nor shall any such petition hereafter to be filed, be continued beyond the first court next after the filing thereof unless for the causes aforesaid.

in the continuation of a bankruptcy proceeding for over a decade. Such an elastic interpretation of the word "dismissal" stretches the definition beyond its logical breaking point.

### *Dismissal Under the Federal Bankruptcy Code Does Not Include All Unsuccessful Bankruptcies and the General Assembly Never Modified the Language to Expand the Tolling Provisions to Include All Unsuccessful Bankruptcy Outcomes*

Turning to modern definitions, "dismissal" is not synonymous with an unsuccessful conclusion of a legal proceeding arising under either Maryland law, or arising under the federal Bankruptcy Code. Modern definitions of the word "dismiss" or "dismissal" are consistent with the 19th century definitions. Black's Law Dictionary defines "dismiss" as: "To send (something) away; [specifically], to terminate (an action or claim) without further hearing, [especially] before the trial of the issues involved." *Dismiss*, Black's Law Dictionary (11th ed. 2019) (Westlaw).

Clearly, the bankruptcy court's denial of a discharge and conversion of Ms. Hoang's bankruptcy to a Chapter 7 proceeding, which is ongoing, did not constitute a dismissal of the bankruptcy petition. The bankruptcy court's actions are quite the opposite of a dismissal—it denied Ms. Hoang a discharge and continued proceedings through the Chapter 7 trustee to marshal Ms. Hoang's assets for the ultimate distribution to creditors. These proceedings have continued for over a decade.

It is also noteworthy that after the emergence of modern federal bankruptcy laws, and during the various recodifications of the Tolling Statute, the General Assembly never modified the language to encompass scenarios other than the "dismissal" of the insolvency petition. With the repeal of almost the entire body of Maryland insolvency laws, a "petition

30

in insolvency" only arises in the context of a federal bankruptcy petition. Given the limited application of the Tolling Statute to bankruptcy cases, we have construed the language of the Tolling Statute consistently with the Bankruptcy Code. *See Ali*, 416 Md. at 249. As we noted in *Ali*, as part of the repeal of Article 47, the adoption of the Uniform Commercial Code, its subsequent recodification in the Commercial Law Article, and the recodification of the Tolling Statute in 1973 for the last time, the Legislature was keenly aware of the preemptive force of the Bankruptcy Code. The Legislature specifically incorporated the definitions contained in the Bankruptcy Code into the Commercial Law Article. As we concluded in *Ali*, "had the Legislature, during its recodification process, desired an alternative definition, it would have enacted one." *Id.* at 264. It is not our role to redefine the word "dismissal" in a manner not borne out by the plain and unambiguous meaning to reach a different outcome. "Dismissal" in this instance does not include proceedings which are not, in fact, dismissed, and are ongoing.

### *Public Policy Does Not Support a Broad Interpretation Not Otherwise Present in the Plain Language*

Mr. Lowery argues that for policy reasons, we should affirm the Court of Special Appeals' interpretation of "dismissal" to embrace all bankruptcies which ultimately end in a manner "unsuccessful" to the debtor's interest—whether the proceeding results in a dismissal of the petition, or the denial of a discharge and an ultimate distribution of the debtor's assets for the benefit of creditors. To be sure, Ms. Hoang's conduct in her bankruptcy proceedings was egregious and the bankruptcy court imposed upon her the most draconian sanction available under the Bankruptcy Code—the denial of a discharge.

31

Although Ms. Hoang is guilty of many misdeeds, this is not a situation where the debtor voluntarily manipulated a bankruptcy proceeding, which ultimately resulted in a dismissal, and which in turn may have prevented a creditor from filing a claim against her during the pendency of the bankruptcy proceeding. Here, the opposite occurred. Ms. Hoang was denied the benefit of a discharge. Once a Chapter 7 trustee was appointed, Ms. Hoang was prevented from manipulating the bankruptcy system in a manner that the Tolling Statute was designed to prevent. Ms. Hoang lost control of her assets, which have been seized and will be distributed to creditors in the priorities provided under the Bankruptcy Code.

When the automatic stay was lifted in March 2006, Mr. Lowery had no impediment under the Bankruptcy Code preventing the renewal of his judgment, which expired in April 2014. We see no policy reason to adopt an interpretation of the term "dismissal" that is inconsistent with the plain language of the insolvency law as it was originally enacted, and which is inconsistent with the dismissal of a petition under the federal Bankruptcy Code.

However, there are sound policy reasons that weigh *against* adopting the Court of Special Appeals' interpretation. Although this case involves a ministerial act of renewing a judgment, our holding concerning the breadth and scope of the Tolling Statute will necessarily apply to all "claim[s] against the debtor." CJ § 5-202. Under the Court of Special Appeals' and the Dissent's interpretation of the Tolling Statute, the statute of limitations on any claim against a debtor could be tolled for a considerable time period well after the expiration of the automatic stay. In this case, the time between the expiration of the automatic stay and the "closure" of Ms. Hoang's unsuccessful ongoing bankruptcy petition is 14 years and counting.

32

In *Ceccone v. Carroll Home Services, LLC*, 454 Md. 680, 691 (2017), this Court noted that "statutes of limitation are designed to balance the competing interests of plaintiffs, defendants, and the public." We explained that a statutory period of limitations

> represents a policy judgment by the Legislature that serves the interest of a plaintiff in having adequate time to investigate a cause of action and file suit, the interest of a defendant in having certainty that there will not be a need to respond to a potential claim that has been unreasonably delayed, and the general interest of society in judicial economy.

*Id.* (citations omitted). This balance is struck "'primarily to assure fairness to defendants on the theory that claims, asserted after evidence is gone, memories have faded, and witnesses disappeared, are so stale as to be unjust.'" *Shailendra Kumar, P.A. v. Dhanda*, 426 Md. 185, 205 (2012) (quoting *Bertonazzi v. Hillman*, 241 Md. 361, 367 (1966)).

Although statutes of limitations are not sacrosanct, *see Ceccone*, 454 Md. at 692, the Court does not craft exceptions to limitations periods without compelling reasons. We apply a "strict construction regarding tolling of statutes of limitations" and, therefore, "absent legislative creation of an exception to the statute of limitations, we will not allow any 'implied and equitable exception to be engrafted upon it.'" *Anderson v. United States*, 427 Md. 99, 120 (2012) (quoting *Hecht v. Resolution Trust Corp.*, 333 Md. 324, 333 (1994) (citations omitted)); *Garay v. Overholtzer*, 332 Md. 339, 359 (1993) (describing narrow construction of statutes of limitations as a "well established principle") (citations omitted).

Mr. Lowery's, the Court of Special Appeals', and the Dissent's interpretation could lead to results clearly not contemplated by CJ § 5-202. Consider this hypothetical: Ms. Hoang was denied a discharge and the automatic stay was lifted on March 22, 2006. Under

Mr. Lowery's desired interpretation, had Ms. Hoang been involved in a fender-bender in May 2005, prior to her filing her bankruptcy petition, the standard three-year statute of limitations under CJ § 5-101 for the other driver to file a claim against her *would still not yet have expired 15 years later*. Once the automatic stay has been lifted and a plaintiff has no legal impediment to prosecuting a claim against a debtor, there is no reason to allow for further delays and invite the inequities of lost evidence, faded memories, and stale disputes.

In this case, Maryland Rule 2-625 provides a simple means for renewal of that period, the judgment holder only needs to file for renewal to place the judgment debtor and court on notice. This is not an onerous burden. We see no reason to excuse Mr. Lowery and other judgment creditors from the minimal diligence and effort required to preserve their judgments. The federal Bankruptcy Code already provides a mechanism for creditors who are anxious about violating the automatic stay to determine what actions to protect their rights are permissible. *See* 11 U.S.C. § 362(d). We will not distort the language of our own statute to provide unwarranted leniency.

### III.    CONCLUSION

We hold that under CJ § 5-202, the word "dismissal" is plain and unambiguous. Under the statute, where a debtor files a petition in insolvency which is later dismissed, the time between the filing and the dismissal is not included in determining whether a claim against a debtor is barred by the statute of limitations. There is nothing in the plain meaning of the statute, the legislative history, or its structure or purpose, which would allow us to broadly define the word "dismissal" to include any bankruptcy proceeding that ends in a manner unfavorable the debtor's interest regardless of whether the case is dismissed. In

34

order for the tolling provision to apply, there must be a "dismissal" of the bankruptcy petition.   To broadly interpret the word "dismissal" to include any "unsuccessful" bankruptcy petitions that do not end with a discharge of debts and a fresh start for the debtor is inconsistent with the concept of "dismissal" under the federal Bankruptcy Code, and inconsistent with the General Assembly's intent to align the remaining insolvency laws with the modern Bankruptcy Code.

**THE JUDGMENT OF THE COURT OF SPECIAL APPEALS IS REVERSED. COSTS TO BE PAID BY RESPONDENT.**

Circuit Court for Montgomery County
Case No.: 223525-V
Argued: October 4, 2019

IN THE COURT OF APPEALS

OF MARYLAND

No. 17

September Term, 2019

MINH-VU HOANG

v.

JEFFREY LOWERY

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Greene, Clayton, Jr. (Senior
Judge, Specially Assigned),

JJ.

Dissenting Opinion by McDonald, J.,
which Getty, J., joins.

Filed: June 5, 2020

The Majority Opinion is very well written, but flawed in its analysis. Accordingly, I cannot join it.

The Majority Opinion's analysis of the issue in this case turns on its "plain meaning" interpretation of an 1814 Maryland statute that tolled statutes of limitations during an insolvency proceeding. The Majority Opinion equates a term in that statute to a similar term in the contemporary federal bankruptcy law – a law that did not exist in 1814, or for many years thereafter. Based on that equation, the Majority Opinion concludes that the current version of the State tolling statute had no effect in this case. Upon closer inspection, however, the linchpin of that analysis – the interpretation of the 1814 statute – falls apart.

The tolling statute is currently codified at Maryland Code, Courts & Judicial Proceedings Article ("CJ"), §5-202. As the Majority Opinion indicates, we are all indebted to a prior opinion of the Court of Special Appeals, which took a deep dive into the history of that statute – an analysis that was adopted by reference by this Court when it affirmed that decision. *See Ali v. CIT Technology Financing Services, Inc.,* 188 Md. App. 269, 277-81 (2009), *aff'd*, 416 Md. 249, 266 n.14 (2010).[1]

As the courts in the *Ali* case explained, the General Assembly enacted an insolvency law in 1805 that, like the later federal bankruptcy law, was intended to relieve debtors from some of the burdens associated with their situation while also devoting what assets they

---

[1] Both appellate courts in that case relied on a comprehensive 19th century treatise on the Maryland insolvency law – John L. Dorsey, A Treatise on the American Law of Insolvency; Containing a Compilation of the Insolvent Laws of Maryland, and the Laws in Relation to Insolvent Debtors of the United States (1832). *See* 188 Md. App. at 278, 283-84; 416 Md. at 268.

had to the benefit of their creditors. Chapter 110, Laws of Maryland 1805. There was apparently some concern that a debtor might misuse the benefits offered by the insolvency act and attempt to defraud creditors. Accordingly, the insolvency act provided that any debtor found to have engaged in "fraud or deceit of his creditors … shall be forever precluded from any benefit of this act." *Id.*, §9. That provision apparently proved insufficient to the task by itself. Fraud "is as old as falsehood and as versable as human ingenuity"[2] and a legislature is always playing catch-up.

Within a decade, the General Assembly came back to the drawing board and enacted the 1814 law to supplement the insolvency act. Particularly pertinent to this case, §3 of that law is the original iteration of CJ §5-202.[3] As the Majority Opinion acknowledges, the General Assembly enacted this provision "to address the public's complaint that debtors manipulated the bankruptcy and insolvency processes to avoid paying creditors by entering bankruptcy, waiting for the statute of limitations to expire, and subsequently dismissing the bankruptcy proceeding." Majority slip op. at 17-18 (quoting *Ali*, 188 Md. App. at 283-84.). So far, so good.

The Majority Opinion takes a wrong turn, however, in construing the language of §3 in light of the rest of the 1814 statute. Section 1 of the 1814 law, which the Majority Opinion largely ignores, appeared designed to address delays in cases under the insolvency

---

[2] *Weiss v. United States*, 122 F.2d 675, 681 (5th Cir.), *cert. denied*, 314 U.S. 687 (1941).

[3] The Court of Special Appeals helpfully appended the full text of that law to its opinion in this case, and I have done the same.

2

act by setting a time limit for the duration of a case, unless additional time is needed to investigate reasons to deny a discharge under the act. Section 2 of the 1814 statute provided for the automatic revival of judgments suspended by an insolvency petition upon "the dismissal or withdrawing of any petition" or "decisions thereon against the petitioner." Section 3 of the statute provided for tolling of the "time intervening between the petitioning of any of said debtors and the time that any said petitions may be dismissed." Comparing §2 and §3 of the statute, the Majority Opinion concludes that the "plain meaning" of these two sections is that there is "automatic reinstatement of judgments in the event of dismissal, withdrawal, or denial of discharge, but … tolling only in the event of dismissal." Majority slip op. at 12.

Such a construction is clearly inconsistent with the purpose of the statute, and imputes a "plain meaning" to this law without taking account of all of the language of the statute in context.

First, as noted above, the purpose of this law was to defeat "debtor abuse"[4] – more specifically, the possibility that a debtor would file a petition, wait for the statute of limitations to run on a creditor's claim, and, once limitations expired, terminate the insolvency proceeding. Under the Majority Opinion's interpretation, §3 was woefully inadequate to this task, even in 1814. Under that interpretation, a debtor who wished to manipulate the process could simply file an insolvency petition, let limitations run on a creditor's claim, and then withdraw the petition. The creditor would have no recourse

---

[4] *Ali,* 416 Md. at 268-69.

3

because, according to the Majority Opinion, the tolling provision did not apply to withdrawals.[5]  And a debtor intent on manipulating the system would not have to be particularly ingenious to see that gaping hole in the anti-manipulation provision.  In my view, there is little doubt that §3 was meant to encompass at least a withdrawal of a petition – what might otherwise be called a voluntary dismissal – as well as an involuntary dismissal.[6]  In addition, as noted above, §1 of the 1814 law created a specific exception to the time limits that the law otherwise set for insolvency proceedings if it appeared that the debtor would be denied a discharge.  It would be incongruous to allow such a debtor – ultimately deemed unworthy of a discharge – to run out the limitations clock on a creditor's claim during that overtime period.  But that is what would happen under the Majority Opinion's construction of §3.

Second, the Majority Opinion's "plain meaning" analysis fails to take account of the precise language used in the 1814 law.  Section 1 states that "no petition … shall be continued" beyond a specified deadline, except for the purpose of defeating a discharge.  Section 2 of the law refers to "any petition for the benefit of [the insolvency act]."  By contrast, §3 refers to "any of said petitions."  The use of "*said* petitions" in §3 seems to be

_____

[5] Indeed, it is difficult to conceive that a debtor bent on defrauding creditors by running out the statute of limitations would hope for someone else to seek *dismissal* of his petition rather than *withdraw* it himself.  Under the Majority Opinion's "plain meaning" interpretation of the 1814 law, the tolling provision would be completely ineffectual.

[6] The Majority Opinion appears to recognize that a withdrawal would be at least equivalent to a dismissal for purposes of the tolling provision, *see* Majority slip op. at 27-28, but is apparently unable to reconcile that insight with the "plain meaning" it otherwise wishes to attribute to §3.

4

a reference back to the broader uses of "*no* petition" and "*any* petition" that fall within the purview of the previous sections. We seldom use a cross-reference like "said" these days, but that does not mean the word is meaningless. This connection between §3 and §§1-2 suggests that the term "dismissed" in §3 should be interpreted in light of §2's broader reference to "the dismissal or withdrawing of any petition" and "decisions thereon against the petitioner" and §1's reference to the denial of a discharge. At the very least, there is ambiguity as to how literally the term "dismissed" in §3 should be understood.

This Court has often reiterated that the "plain meaning" of a statute prevails provided that "the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose." *Lockshin v. Semsker*, 412 Md. 257, 275 (2010). Here, however, the Majority Opinion adopts a "plain meaning" of arguably ambiguous language that is clearly *in*consistent with the statute's apparent purpose.

In my view, the analysis of the Court of Special Appeals in this case is more consistent with the purpose of the Maryland insolvency laws that spawned CJ §5-202 – that it "was adopted to ensure that creditors, whose debtors failed in obtaining a discharge, wouldn't be worse off for cooperating in the process." 240 Md. App. 240, 248 (2019). Accordingly, I would adopt the analysis set forth in that opinion and affirm the judgment of the Court of Special Appeals.

Judge Getty advises that he joins this opinion.

# APPENDIX

## CHAPTER 122.
November Session 1814
*An Additional Supplement to the act entitled, An act for the relief of sundry Insolvent Debtors.*

Sec. 1. BE IT ENACTED by the General Assembly of Maryland, That no petition for the benefit of the original act for the benefit of sundry insolvent debtors, and the several supplements thereto, now depending in any of the county courts of this state, shall be continued beyond the second session of such court next after the passage of this act, unless in cases where the court shall be satisfied a further continuance is necessary to procure testimony material and competent on the trial of any allegations made against the petitioner's discharge, nor shall any such petition hereafter to be filed, be continued beyond the first court next after the filing thereof unless for the causes aforesaid.

2. That upon the dismissal or withdrawing of any petition for the benefit of said acts, or upon decisions thereon against the petitioner, it shall not be necessary to revive by *scire facias* any judgment which may have been suspended by such petition, and process of execution may be issued upon such judgments as if no such suspension had taken place.

3. That the time intervening between the petitioning of any of said debtors, and the time that any of said petitions may be dismissed, shall not be computed on any plea of limitation so as to defeat any claim of any person against such debtor.